49 A.3d 388

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v.
AURELIO RAY CAGNO, DEFENDANT–APPELLANT.

Argued September 27, 2010—Reargued October
24, 2011—Decided August 8, 2012.

492

*James K. Smith, Jr.,* Assistant Deputy Public Defender, argued the cause for appellant (*Joseph E. Krakora,* Public Defender, attorney).

*Steven A. Yomtov,* Deputy Attorney General, argued the cause for respondent (*Paula T. Dow,* Attorney General of New Jersey, attorney).

*Aurelio Ray Cagno* submitted a supplemental brief, pro se.

Judge WEFING (temporarily assigned) delivered the opinion of the Court.

In 1981, the New Jersey Legislature, convinced that "the existence of organized crime and organized crime type activities

presents a serious threat to the political, social and economic institutions of this State," *N.J.S.A.* 2C:41–1.1, adopted *N.J.S.A.* 2C:41–1 to –6.2, New Jersey's counterpart to the Federal Racketeer Influenced and Corrupt Organizations Act (RICO), 18 *U.S.C.* §§ 1961–1968. In this appeal, we are called upon to consider whether defendant Aurelio Ray Cagno's 2004 conviction for racketeering conspiracy was time-barred under the general five-year statute of limitations governing criminal prosecutions, *N.J.S.A.* 2C:1–6. We consider whether certain evidence was improperly introduced during defendant's 2004 trial to establish the continuation of the criminal conspiracy and whether that evidence was so prejudicial that defendant's murder conviction, achieved at the same trial that resulted in his RICO conviction, is irremediably tainted and should be reversed. Defendant also challenges certain of the trial court's instructions that were provided to the jury that found defendant guilty of all the charges he faced. Finally, defendant raises an issue related to his sentence. We have considered the arguments and studied the extensive record on which they are based. We are satisfied that defendant has presented no basis upon which his convictions or sentence should be reversed. Accordingly, we affirm.

I.

These questions come to us from the following factual and procedural background. Although a RICO enterprise need not have a defined organization, structure, or leadership, *United States v. Bergrin,* 650 *F.*3d 257, 274 (3d Cir.2011), the RICO enterprise at issue in this appeal does have such a defined structure and organization the nature of which bears upon several of the issues. We therefore set it forth in some detail.

Organized crime can develop and exist in many different formulations; the one pertinent to this appeal is "La Cosa Nostra," a nation-wide network of enterprises, referred to as "families," devoted to generating profits for its members through criminal activities. This matter is focused on the New Jersey "crew" of the

Colombo family, one of seven primary La Cosa Nostra families that are active in the New York/New Jersey/Philadelphia area. At defendant's trial, the State presented evidence with respect to the structure and operation of La Cosa Nostra families. That structure and organization has also been described in federal cases involving prosecution of other defendants affiliated with La Cosa Nostra. *See, e.g., United States v. Pizzonia*, 577 *F*.3d 455 (2d Cir.2009); *United States v. Persico*, 832 *F*.2d 705 (2d Cir.1987).

La Cosa Nostra families are organized on a hierarchical basis. At the bottom of this hierarchy are "soldiers" who have taken an oath of loyalty to the family and are organized into functional units called "crews," which are headed by "captains" or "capos." The family is headed by a "boss" who is assisted by an "underboss" and a "consiglieri" or "counselor."

One becomes a member of the family by demonstrating loyalty to the family over an extended period of time. One does not simply announce a desire to be a family member; one must be sponsored by a captain and take an oath. The oath is administered at a ceremony at which the prospective member is introduced to the family's existing membership and is offered the opportunity to decline full membership. If the candidate elects to proceed, he swears allegiance to the family above all. The oath is critical: an inductee swears that if he betrays the family in any manner, but particularly by cooperating with law enforcement, he will burn in Hell for eternity. If a member later violates that oath of silence, the head of the family will order his execution. An individual who has taken the oath of silence is referred to as a "made" member. Membership is for life, and neither withdrawal nor retirement is an option for an individual who has taken the oath.

## II.

The State's case against defendant revolves around his membership in the New Jersey crew of the Colombo family of La Cosa Nostra. Defendant's brother Rocco Cagno was also a member of

the Colombo family. For ease of understanding for the balance of this opinion we shall refer to defendant, Aurelio Ray Cagno, as defendant and his brother as Rocco. Despite the oath of silence each had taken, the State's principal witness against defendant was his brother Rocco.

Rocco testified that he and defendant had been associated with La Cosa Nostra from at least the early 1970s but that they did not become "made" members until 1987. During that early period, Rocco engaged in various criminal enterprises affiliated with La Cosa Nostra and worked with James Randazzo. In its opinion, the Appellate Division summarized Rocco's testimony about the ceremony at which he and defendant were "made."

> In July 1987 Randazzo told Rocco that he and defendant were going to be "made." Randazzo, Rocco, defendant and Tony Scianna, an acting Colombo capo, drove to Queens, New York where the "making" ceremony took place. Randazzo was Rocco's sponsor. Their fingers were pricked with a needle and their blood was smeared on a cardboard image of a saint, which was ignited. Holding the burning saint, Rocco swore that if he broke the oath of silence (Omerta) he would "burn in hell as [the] saint ... burn[ed] in [his] hand." He also promised that he would "do a piece of work" (kill someone) if requested.
> [State v. Cagno, 409 N.J.Super. 552, 563, 978 A.2d 921 (App.Div.2009).]

Rocco testified that in 1988 he and defendant were instructed to assist with the killing of Jimmy Angellino, an acting consigliere of the family. He stated that Randazzo selected Rocco's home for the execution because its layout permitted people to enter without being seen. Rocco, defendant, and others were waiting at the house; when Angellino entered, the lights went out and guns fired. When the light returned, Angellino's body was crumpled on the steps. Randazzo put the body in a body bag that he had brought with him and drove off. Rocco and defendant cleaned the scene and then disposed of the bloodied cleaning supplies in a dumpster.

Rocco testified that in 1991 or 1992 an internal struggle developed within the Colombo family. There was concern that individuals might betray the oath of silence and, in doing so, reveal the Angellino murder. Rocco said that defendant relayed to him instructions from a Colombo superior, Carmine Sessa, that he

should replace the steps onto which Angellino had collapsed in order to remove any possibility that testing could reveal hidden blood stains.

Rocco admitted that this was not the first nor the last homicide with which he was involved. He testified that prior to becoming a "made" member, he assisted Randazzo in killing a man who owed money to Randazzo in connection with the loan shark operation that Randazzo conducted.

In 1992, Randazzo was incarcerated on unrelated charges, and another family member, Dominic Prosperi, took over responsibility for collecting payments from individuals who owed money to Randazzo. In December 1992, the FBI, executing a search warrant it had obtained for the home of Dominic's father, Joseph Prosperi, recovered the notebook in which Randazzo kept track of his loan-shark business. Rocco testified that while he was visiting Randazzo in jail, he told Randazzo that his loan-sharking notebook had been seized by the FBI during the search. Rocco testified that Randazzo was upset at hearing that information and feared that he might be executed for permitting a record of the organization's criminal activities to fall into the hands of law enforcement. According to Rocco, Randazzo said he was "dead."

Randazzo's reaction caused Rocco to become concerned that Randazzo might violate the oath of silence and, as part of negotiating a deal for himself, implicate Rocco in the two murders. Rocco discussed his concern with defendant, who had also been involved in the Angellino murder, and with another family member, Salvatore Lombardino (nicknamed "Tutti"). The three men, over several months, discussed the possibility of murdering Randazzo to prevent him from "turning." Their concerns increased when they learned that Randazzo, who had been released from custody, was selling his car and calling in the loans due to him; the three viewed those actions as steps toward relocating from the area.

Rocco acknowledged that protocol within La Cosa Nostra called for the three to obtain the approval of a superior in the organization before killing another member. He testified that they did not

seek such approval for fear that in doing so they might endanger themselves. The three agreed that Randazzo had to be killed, and Rocco said that defendant was designated as the shooter. They knew that Randazzo was seeking a meeting with Sal Profaci, a leader in the Colombo family, and used that as a ruse to lure Randazzo to a meeting.

On May 17, 1993, Rocco, defendant, and Lombardino traveled in Lombardino's car and met Randazzo in a motel parking lot in Tinton Falls, New Jersey, from where the four were to travel to another site, purportedly to meet Profaci. Defendant got in Randazzo's car. Defendant and Randazzo got into a struggle, and a shot was fired; Rocco and Lombardino ran up to help defendant, and several more shots were fired into Randazzo's car. The three returned to Lombardino's car and sped off. Rocco said that defendant told him that he was sure Randazzo was dead because he had fired a bullet into Randazzo's head. Rocco took the several guns the three had with them, wiped them clean of prints, and tossed them out the window as they drove away.

A subsequent search of Randazzo's car by law enforcement turned up the search warrant and inventory from the Prosperi search that had caused Randazzo such concern. A .38 caliber discharged bullet and several bullet fragments were also recovered.

Several people were in the vicinity of the shooting, and at least one person wrote down the license plate number of Lombardino's car and gave it to the police at the scene. Learning that a car registered to Lombardino had been at the scene, police searched his home and retrieved a box of .38 caliber ammunition. The police were also able to obtain records showing that an unusual number of telephone calls were exchanged between Rocco's residence and defendant's residence in the early morning hours of May 18. Defendant's house was searched on May 18, and among the items recovered were two slips of paper; the first had Randazzo's name and telephone number, and the second said "Tutti ... beeper."

During their investigation, the police recovered three .38 caliber handguns and ammunition that had been discarded along roadways. One handgun contained two discharged shell casings. Testing linked the weapons to Randazzo's murder.

In addition, several days after the murder, Lombardino's car was found abandoned in an industrial section of Brooklyn. Its back seat and license plates had been removed. DNA testing found a match between Randazzo's blood and a stain on the rear driver's-side door of the car. A number of cigarette butts were recovered from the rear of the vehicle, and DNA testing was performed on them. Three cigarette butts bore DNA consistent with defendant and from which ninety-one percent of the Caucasian population, including Rocco and Lombardino, were excluded.

As part of the investigation, both defendant and Lombardino were placed in line-ups. Although Lombardino was identified in the line-up by people who had been at the scene, defendant was not identified.

As the investigation into the Randazzo murder continued, Rocco began to think that it would be to his advantage to cooperate with law enforcement. In November 1993, Rocco, defendant, and two others were indicted in the Eastern District of New York for the November 1988 murder of Angellino, conspiracy to murder Angellino, and weapons offenses. In February 1994, a federal indictment was returned against Lombardino in the District of New Jersey for the murder of Randazzo.

Shortly before the 1994 indictment, on January 20, 1994, Rocco met with Lombardino, who was unaware of Rocco's change of heart. Rocco wore a recording device to the meeting. Lombardino asked whether Rocco had spoken to defendant and Rocco responded that he was to see defendant in a few days. Lombardino said that they had to meet to develop their alibi with respect to the Randazzo slaying. He told Rocco, "We'll sit down, ... the three of us, and see how we're gonna handle this." Lombardino said that he would explain the presence of Randazzo's blood in his

car by telling the police that Randazzo had been a passenger in the car and had developed a bloody nose.

In March 1994, Rocco entered a plea and cooperation agreement with the Offices of the United States Attorneys for the Eastern District of New York and the District of New Jersey. It was agreed that he would enter a guilty plea to one count of conspiracy to engage in a pattern of racketeering activity, including three conspiracies to commit murder, and would cooperate with the government's investigation into organized crime. The agreement contained the following limitation:

> Rocco Cagno has expressed a strong unwillingness to testify against his brother, Aurelio "Ray" Cagno, even though he has identified Aurelio Cagno as having been a main participant in the Randazzo and Angellino murders. Recognizing this sensitivity, the Government agrees to make every reasonable effort to obviate the necessity of having to call Rocco Cagno as a witness against his brother, as a defendant. This provision does not, however, create any right on behalf of Rocco Cagno. Therefore, it is understood that if a good faith effort to develop alternative legally sufficient evidence is unsuccessful and, therefore, it becomes necessary to call Rocco Cagno as a witness against his brother in order to prevent a failure of justice, Rocco Cagno will be required to provide truthful testimony about the involvement of Ray Cagno in the planning and commission of the Randazzo and Angellino murders with others, in accordance with the provisions of this agreement and as otherwise required by law.

The government proceeded to try Lombardino on the charges relating to the 1993 Randazzo killing. Lombardino's first trial resulted in a mistrial, but in October 1994, while the second trial was in progress, Lombardino pled guilty to conspiracy to commit murder in aid of racketeering, a weapons offense, and being an accessory after the fact. Lombardino faced a maximum sentence for those offenses of seventeen years. Lombardino's plea agreement specifically provided that in the event Lombardino testified on behalf of defendant with respect to the murder of Randazzo, the government could reinstate against Lombardino a charge of murdering Randazzo, 18 *U.S.C.* § 1959(a)(1), which carried a life sentence. At sentencing, Lombardino received a term of seventeen years.

Approximately a year later, in November 1995, defendant pled guilty in the Eastern District of New York to racketeering con-

spiracy. Although he admitted participating in a conspiracy to murder Angellino, he specifically refused to name any other participants in that conspiracy. During his plea colloquy he said that he was "not privy to whatever activities some people may or may not have been involved in" and was "not naming the people in the indictment" and "not allocating [sic] to anyone else's involvement." Based upon his plea, defendant was sentenced to five years in prison.

The government continued its investigation into the Randazzo murder, and in May 1998, Lombardino was summoned before a federal grand jury. Prior to being questioned, he was informed that he had been granted immunity and had to answer truthfully the questions posed to him. Lombardino answered questions with respect to his involvement and that of Rocco who, in connection with his own negotiated guilty plea, had admitted his involvement in the murder of Randazzo. Lombardino refused, however, to answer any questions having to do with defendant and the Randazzo murder. Lombardino's refusal resulted in his being found in contempt of court.

The Government then summoned Rocco to appear before the grand jury in December 1998. Rocco had testified against Lombardino in 1994, and he acknowledged before the grand jury that he had testified with respect to his involvement and that of Lombardino with La Cosa Nostra and the murder of Randazzo. This time Rocco went further, however, and indicated that he was now willing to testify against defendant, his brother.

Based upon Rocco's change of heart, a state grand jury returned a two-count indictment against defendant in February 2000. The first count alleged racketeering conspiracy, a crime of the first degree, in violation of *N.J.S.A.* 2C:41–2(c), and named Lombardino as an unindicted co-conspirator. It alleged that defendant was a member of the New Jersey crew of the Colombo crime family of La Cosa Nostra, set forth the organizational structure of the family, and stated the purposes of the conspiracy: (1) to obtain money for the members through various criminal

activities; (2) to conceal the existence and activities of the family; (3) to continue the activities of the family through an organized structured chain of command; and (4) to keep outsiders in fear of the enterprise through threats and acts of violence. The indictment charged that defendant had engaged in a pattern of racketeering activity including conspiracy to commit murder, loan sharking, bookmaking, possession and distribution of gambling equipment, and extortion. The indictment alleged four overt acts in furtherance of the conspiracy: (1) participating in the planning and commission of the November 1988 murder of Angellino; (2) the May 1993 killing of Randazzo; (3) the January 1994 conversation between Lombardino and Rocco with respect to meeting with defendant to develop an alibi for the Randazzo murder; and (4) Lombardino's refusals in May and October 1998 to answer any questions concerning the involvement of other people in Randazzo's murder despite having been granted full immunity. The second count of the indictment charged defendant with the murder of Randazzo, in violation of *N.J.S.A.* 2C:11–3(a)(1) and (2).

The trial for the charges in the 2000 indictment began in May 2002. Lombardino was called to appear as a witness in this trial on June 13, 2002 and was placed on the stand out of the presence of the jury. Lombardino invoked his Fifth Amendment right not to incriminate himself and refused to answer any questions. The trial court, in response to the prosecutor's request, granted Lombardino immunity and based upon his continued refusal to answer questions, held him in contempt. Lombardino was called to the stand a second time on June 18, 2002, and again, out of the presence of the jury, refused to answer any questions. Rocco appeared at this trial and testified against his brother. The matter was tried to conclusion, but the jury was unable to reach a verdict on either count, and a mistrial was declared on June 28, 2002.

The government elected to try defendant a second time but first obtained a superseding indictment on January 2, 2003. This superseding indictment also contained two counts: one charging

defendant with first-degree racketeering conspiracy and one charging him with the murder of Randazzo. It again named Lombardino as an unindicted co-conspirator and repeated the allegations in the earlier indictment with respect to defendant's involvement with the New Jersey crew of the Colombo crime family and its structure, purposes, and methods of operation. The superseding indictment named five overt acts in furtherance of the conspiracy: (1) the Angellino murder in November 1988; (2) the May 1993 killing of Randazzo; (3) the January 1994 conversation between Lombardino and Rocco with respect to meeting with defendant to develop an alibi for the Randazzo murder; (4) Lombardino's refusal on June 13, 2002, to testify in defendant's first trial; and (5) Lombardino's further refusal to testify on June 18, 2002. It omitted the reference to Lombardino's refusals in May and October 1998 to answer any questions with respect to the matters that had been included in the original indictment as overt acts in furtherance of the conspiracy.

Defendant's trial under the superseding indictment commenced in January 2004. Again, Rocco appeared and testified against his brother. And again, the government called Lombardino as a witness. Out of the presence of the jury, he again invoked his Fifth Amendment right not to testify. He was again granted immunity but persisted in refusing to answer questions, and he was held in contempt. During defendant's second trial, the State presented two witnesses who had been present in the courtroom on June 13 and June 18, 2002, when Lombardino had refused to testify in defendant's first trial. Those two witnesses recounted for the jury in the second trial what they observed in the first trial, which we shall set forth in some detail later in this opinion. The jury returned a verdict of guilty on both counts on March 5, 2004. On June 4, 2004, the trial court sentenced defendant to life in prison for murder, with a thirty-year period of parole ineligibility, and to a consecutive twenty years in prison, with a ten-year period of parole ineligibility, for racketeering conspiracy. Defendant's aggregate sentence was life plus twenty years with forty years of parole ineligibility.

Defendant appealed his convictions and sentence, both of which were affirmed by the Appellate Division. *Cagno, supra,* 409 *N.J.Super.* at 604, 978 *A.*2d 921. Defendant filed a petition for certification, both through counsel and pro se. We granted defendant's petition, limited to the issues raised in the petition filed by counsel; we denied certification with respect to the issues defendant raised in his pro se petition. *State v. Cagno,* 200 *N.J.* 550, 985 *A.*2d 648 (2009).

## III.

Defendant argues that the State failed to prove any overt act in furtherance of the conspiracy beyond the January 20, 1994, conversation between Rocco and Lombardino. That conversation, he maintains, was outside the five-year statute of limitations. Defendant contends that his prosecution was time-barred.

Defendant presents an alternative argument in support of his position that his prosecution was time-barred. He points to the fact that on November 27, 1995, he pled guilty in federal court in the Eastern District of New York to racketeering conspiracy. He asserts that the guilty plea ended the conspiracy and started the running of the period of limitations.

Defendant also argues that the evidence related to the charge of racketeering conspiracy permeated the trial. Based upon his premise that the racketeering charge should not have proceeded to trial, he maintains that his trial on the charge of murdering Randazzo was unfairly tainted and that the conviction for murder should be set aside.

Defendant further contends that the trial court erred in its instructions to the jury. He argues that the instructions with respect to the first count of the indictment charging defendant with racketeering conspiracy were deficient in a number of aspects. He also asserts that the trial court erred in its instructions regarding the second count of the indictment charging him with the murder of Randazzo when it failed to include instructions on the lesser-included offense of conspiracy to commit murder.

In addition, defendant argues that the manner in which the trial court permitted the prosecution to admit evidence dealing with Lombardino's refusal to testify at defendant's first trial violated defendant's rights under the Sixth Amendment to the United States Constitution.

Defendant's final assertion is that his sentence for racketeering conspiracy is illegal. He maintains that racketeering conspiracy is a crime of the second degree and thus that he should not have received a sentence in the first-degree range.

The State counters those arguments. It asserts that more than sufficient evidence was introduced at defendant's trial to demonstrate that the racketeering conspiracy continued beyond January 20, 1994. It also asserts that defendant's plea of November 27, 1995, did not constitute either an abandonment or termination of the conspiracy. It notes defendant's refusal at the time of his plea to acknowledge the participation of anyone other than himself. The State contends that the trial court's instructions were entirely correct, that there was no violation of defendant's right of confrontation, that defendant's racketeering conspiracy conviction was for a crime of the first degree, and that defendant's sentence, as a result, was fully justified.

## IV.

Before turning to these issues, we note the standard of review that governs our consideration and analysis. None of the issues involve a challenge to fact-finding on the part of the trial court; each involves a question of law that defendant contends was decided incorrectly by the trial court and the Appellate Division. When a court's conclusion is based on its

"interpretation of the law and the legal consequences that flow from established facts," its conclusion is "not entitled to any special deference." *Manalapan Realty, L.P. v. Twp. Comm.*, 140 *N.J.* 366, 378 [658 *A.2d* 1230] (1995) (citation omitted). As such, our review is de novo. *See ibid.* Moreover, the standards governing the performance of our de novo interpretive task are equally well known. When we examine a statute, "our goal is to discern and effectuate the Legislature's intent. [Thus, t]he plain language of the statute is our starting point." *Patel v. N.J. Motor*

*Vehicle Comm'n*, 200 *N.J.* 413, 418 [982 *A.*2d 445] (2009) (quotation marks and citations omitted).
[*State v. Hupka*, 203 *N.J.* 222, 231, 1 *A.*3d 640 (2010).]

*Our review of defendant's contentions is thus plenary. It is, moreover, guided by the Legislature's explicit statement that N.J.S.A. 2C:41–2 "shall be liberally construed to effectuate the remedial purposes of this chapter." N.J.S.A. 2C:41–6.*

## V.

We turn first to defendant's argument that the trial court erred at various points when, in connection with the 2000 indictment and again in connection with the 2003 superseding indictment, it denied his motions to dismiss the indictments as having been brought beyond the permissible limitations period.

There are two aspects to defendant's argument with respect to his claim that his prosecution was time-barred. The first is that in connection with his 2000 indictment, the government presented no proof that the conspiracy continued after the tape-recorded conversation of January 20, 1994, between Rocco and Lombardino and thus that the entire indictment should have been dismissed as untimely. The second is that the superseding indictment of January 2, 2003, was time-barred because, again, there was no proof of any acts in furtherance of the alleged conspiracy within five years of the indictment being filed. We reject defendant's argument because we are satisfied that it misapprehends the fundamental nature of a charge of RICO conspiracy, as well as the critical distinction between a RICO conspiracy charge and a RICO substantive charge.

▮▮▮ "[I]n New Jersey, the statute of limitations in a criminal statute is tantamount to an absolute bar to the prosecution of the offense." *State v. Short*, 131 *N.J.* 47, 55, 618 *A.*2d 316 (1993). It "is more than merely an affirmative defense to be asserted by a defendant." *Ibid.* Under *N.J.S.A.* 2C:1–6(b)(1), a prosecution for a crime generally "must be commenced within five years after it is committed." The statute defines when an offense is committed: it

is "either when every element occurs or [if the code prohibits a continuing course of conduct], at the time when the course of conduct or the defendant's complicity therein is terminated." *N.J.S.A.* 2C:1–6(c). Further, the statute defines the commencement of a prosecution as the date "when an indictment is found." *N.J.S.A.* 2C:1–6(d). Also relevant to the issue is *N.J.S.A.* 2C:1–6(e), which provides in pertinent part that the limitation period "does not run during any time when a prosecution against the accused for the same conduct is pending in this State." Determining when the period of limitations commences and ends is inherently difficult in a conspiracy prosecution "[f]or every conspiracy is by its very nature secret." *Grunewald v. United States,* 353 *U.S.* 391, 402, 77 *S.Ct.* 963, 972, 1 *L.Ed.*2d 931, 942 (1957).

## A.

At defendant's second trial, the trial court instructed the jury that the State had to prove beyond a reasonable doubt that the alleged RICO conspiracy continued at least until January 2, 1998, five years before the superseding indictment was returned. Neither party challenged the use of that date on defendant's appeal, and the Appellate Division conducted its analysis of the question of whether defendant's prosecution was barred by the five-year statute of limitations from the perspective of that date as well.

When the matter was pending before this Court, we requested supplemental briefing from the parties on the question of whether the cut-off date for purposes of the statute of limitations should be February 24, 2000, the date of the original indictment, rather than the later date of the superseding indictment. We posed that query in light of the tolling provision in *N.J.S.A.* 2C:1–6(e) because the superseding indictment alleged the same conduct as that alleged in the original indictment. The original indictment was not dismissed prior to the return of the superseding indictment, and thus, under the statutory tolling provision, the limitation period was tolled while that indictment was pending.

We have reviewed and considered the parties' supplemental arguments with respect to this question. We conclude the statutory tolling provision removes the analytical premise for this aspect of defendant's argument; however, we further conclude that fairness requires that we not, at this juncture, rest our decision completely on a basis that was never raised before the trial court or the Appellate Division. Trial strategy was formulated and arguments framed on the basis that the operative date for purposes of the statute of limitations is January 2, 2003. Such a fundamental premise should not be changed at the final stage of defendant's appeal, particularly because we are satisfied that whichever date is selected, defendant's prosecution was not barred by the statute of limitations.

### B.

In analyzing defendant's contentions, it is appropriate to turn to federal cases that have considered similar limitations challenges. Defendant contends that we are not bound by these federal cases, and that is indeed correct. Our case law has recognized, however, that because our New Jersey RICO statute is modeled upon its federal counterpart, it is appropriate to "accept[ ] 'guidance' from the federal RICO cases." *Cagno, supra,* 409 *N.J.Super.* at 584, 978 *A.*2d 921 (quoting *State v. Ball,* 268 *N.J.Super.* 72, 98, 632 *A.*2d 1222 (App.Div.1993), *aff'd,* 141 *N.J.* 142, 661 *A.*2d 251 (1995), *cert. denied sub nom. Mocco v. New Jersey,* 516 *U.S.* 1075, 116 *S.Ct.* 779, 133 *L.Ed.*2d 731 (1996)) (citing *State v. Bisaccia,* 319 *N.J.Super.* 1, 20–21, 724 *A.*2d 836 (App.Div.1999)). Defendant has, moreover, not pointed us to any other state that has declined to look to such federal analysis and, in our view, has not proffered any persuasive reason why we should decline to do so.

We have had the occasion to note the particular characteristics of a charge of racketeering conspiracy under our RICO statute. "The pattern of racketeering activity and the activity criminalized under RICO should be, or threaten to be, ongoing.... RICO was

not designed to punish mere repeated offenses." *State v. Ball,* 141 *N.J.* 142, 167, 661 *A.*2d 251 (1995).

Federal cases have repeatedly noted the significance of an indictment alleging a RICO conspiracy, as opposed to other forms of conspiracy. For example, the Second Circuit has stated that

a RICO conspiracy is never simply an agreement to commit specified predicate acts that allegedly form a pattern of racketeering. Nor is it merely an agreement to join in a particular enterprise. Rather, it is an agreement to conduct or to participate in the conduct of a charged enterprise's affairs *through* a pattern of racketeering.

[*Pizzonia, supra,* 577 *F.*3d at 464. *See generally id.* at 467 (upholding defendant's conviction for RICO conspiracy under statute of limitations challenge even though jury found only two overt acts proven that were both beyond five years of indictment).]

■ Defendant points to *N.J.S.A.* 2C:1–6(c), under which the statute of limitations begins to run on conspiracy "when the course of conduct or the defendant's complicity therein is terminated." He contends that there was no proof of any overt act beyond the January 1994 conversation between Lombardino and Rocco and that the conspiracy did not extend beyond that point. Defendant's argument, however, views the charged conspiracy as a conspiracy (1) to murder Angellino; (2) to engage in loansharking; (3) to murder Randazzo; and (4) to possess gambling equipment. That characterization would be accurate if defendant had been charged with conspiracy under *N.J.S.A.* 2C:5–2, but he was not; instead, he was charged with RICO conspiracy under *N.J.S.A.* 2C:41–2.

■ The allegation against defendant was that he conspired to participate through a pattern of racketeering activity in the New Jersey crew of the Colombo crime family, an "enterprise" under *N.J.S.A.* 2C:41–1(c), that had the object or purpose of obtaining money, concealing and perpetuating the existence of the enterprise, and intimidating those outside the enterprise with violence and threats of violence. The allegation of conspiring to engage in a pattern of racketeering with a RICO enterprise encompassed a far broader scope than the lens defendant employs to view the charges against him. Based upon the continuing nature of a RICO enterprise, "the statute of limitations for RICO conspiracy

should not begin to run until the accomplishment or abandonment of the objectives of the conspiracy." *Persico, supra,* 832 *F.*2d at 713.

The Appellate Division relied on these principles when it rejected defendant's arguments. In support of its position, it cited *United States v. Yannotti,* 541 *F.*3d 112 (2d Cir.2008), in which that defendant made essentially the same argument defendant presents here. The Second Circuit rejected that argument, as do we.

The Second Circuit noted that proof that a defendant "agreed to participate in the affairs of the enterprise through a pattern of racketeering activity" does not require proof that "the defendant himself agreed that he would commit two or more predicate acts." *Id.* at 121. It continued that "a defendant need only know of, and agree to, the general criminal objective of a jointly undertaken scheme" to be found guilty of RICO conspiracy. *Id.* at 122.

The Second Circuit rejected the defendant's statute of limitations argument, which mirrors defendant's position before us.

To the extent Yannotti maintains that, even if the government proved his involvement in the charged conspiracy, the statute of limitations required proof of his specific agreement to commit predicate acts within five years of indictment, he conflates our precedent with respect to substantive RICO and RICO conspiracy. Although a "substantive RICO charge is barred by limitations as to any defendant unless *that defendant* committed a predicate act within the five-year limitations period," a RICO conspiracy "is complete, thus commencing the running of the five-year statute of limitations, only when the purposes of the conspiracy have either been accomplished or abandoned." *United States v. Salerno,* 868 *F.*2d 524, 534 (2d Cir.1989) (emphasis in original). Accordingly, even if a defendant engaged in predicate conduct that occurred outside of the statute of limitations, that defendant remains liable for RICO conspiracy unless the evidence shows that the conspiracy concluded or he withdrew from that conspiracy more than five years before the indictment. *See [ibid.]; Persico, [supra,]* 832 *F.*2d at 713. This is because once the government meets its burden of proof to establish a RICO conspiracy, "it is entitled to a presumption that the conspiracy continued until [the] defendant demonstrate[s] otherwise." *United States v. Spero,* 331 *F.*3d [57,] 61 [ (2d Cir. 2003) ].

[*Id.* at 123.]

The Appellate Division in its opinion referred to that presumption, and defendant argues that, in doing so, it deprived him of his

Fourteenth Amendment rights. Defendant frames that argument in line with his contention that such a presumption improperly relieves the State of the burden of proving an essential element of the offense. *See Carella v. California,* 491 *U.S.* 263, 265, 109 *S.Ct.* 2419, 2420, 105 *L.Ed.*2d 218, 221 (1989). Defendant argues that the Appellate Division, with its reliance on *Yannotti,* improperly allocated to him the burden of showing the prosecution was time-barred. Our review of the record in this case satisfies us that it is unnecessary to determine whether New Jersey should follow case law with respect to such a presumption that has developed in several federal circuits. *See, e.g., Yannotti, supra,* 541 *F.*3d at 123; *United States v. Starrett,* 55 *F.*3d 1525, 1550 (11th Cir.1995); *United States v. Torres Lopez,* 851 *F.*2d 520, 525 (1st Cir.1988).

The State was not obligated to present direct evidence of an overt act that took place at a date later than the January 20, 1994, conversation between Lombardino and Rocco. There was other evidence presented during the trial that would permit the jury to infer that the enterprise continued past that date. In determining whether the State proved the existence of the RICO conspiracy within the relevant time period, we consider whether "the totality of the evidence permitted a reasonable jury to find that the charged conspiracy [continued] ... into the limitations period." *Pizzonia, supra,* 577 *F.*3d at 462.

The enterprise for purposes of the RICO statute, the New Jersey crew of the Colombo crime family, encompassed far more than the two Cagno brothers, Lombardino, and Randazzo. The State presented William Newsome as an expert witness in the field of organized crime and the investigation of organized crime. During the course of his testimony about the structure and activities of La Cosa Nostra, Newsome told the jury that once an individual becomes a member of La Cosa Nostra, he is a member for life.

Testimony was replete throughout the trial of meetings with other members of the crew and with crew superiors, as well as to the long-standing nature of the enterprise. Rocco, for instance,

testified that during the time that he, Lombardino, and defendant were planning to murder Randazzo, Lombardino was coming up to his fortieth anniversary as a made member. Surely the jury could infer that an entity in which Lombardino had been a member for such a protracted period did not cease to exist after January 20, 1994. Further, Rocco testified that after he decided to cooperate with the government despite his previous oath of silence, he entered the federal witness protection program in which he remained at the time of trial. He explained to the jury that even as of the date of the trial, if any made member found him, he would be killed.

That evidence, together with the other detailed evidence presented during the course of the trial with respect to the hierarchical, structured nature of the New Jersey crew of the Colombo crime family and the extensive activities in which it engaged, permitted the jury to infer that the enterprise was an ongoing entity and did not disappear from existence after January 20, 1994. Finally, even the conversation of January 20, 1994, which defendant identifies as the end point of his involvement, with its references to meeting in the future with defendant to coordinate alibis, was evidence that the enterprise was ongoing.

Juries are routinely instructed that they may draw logical inferences from the evidence presented to them and that circumstantial evidence is of as equal weight as direct evidence. Courts have regularly held that conspiracy may be proven through circumstantial evidence. *State v. Samuels,* 189 *N.J.* 236, 246, 914 *A.*2d 1250 (2007) ("Because the conduct and words of co-conspirators is generally shrouded in silence, furtiveness and secrecy, the conspiracy may be proven circumstantially." (internal quotation marks omitted)); *see also United States v. Fullmer,* 584 *F.*3d 132, 160 (3d Cir.2009). We can perceive no basis to depart from those settled evidential principles in analyzing defendant's arguments.

Further, it is critical to note that the trial court did not instruct the jury that it could rely on such a presumption. Rather, the

trial court charged the jury that to find defendant guilty of racketeering conspiracy, it had to find

> beyond a reasonable doubt that the racketeering conspiracy did not terminate prior to January 2, 1998, which is five years prior to the date of the indictment.

> In other words, proof beyond a reasonable doubt of an overt act in furtherance of the conspiracy or some other evidence of the vitality of the conspiracy after January 2nd must be found.

Further, the Court clearly told the jury that the burden of proof remained on the State at all times. Nothing within the court's charge intimated that defendant had to prove the conspiracy had come to an end. There is no indication that the jury was confused about that essential element.

Finally, we reject defendant's contention that his November 1995 guilty plea ended his part of the conspiracy such that the limitations period commenced to run at that point. *N.J.S.A.* 2C:5–2(f)(3) provides that if an individual abandons an agreement to conspire, "the conspiracy is terminated as to him only if and when he advises those with whom he conspired of his abandonment or he informs law enforcement authorities of the existence of the conspiracy and of his participation therein." Clearly, defendant is not entitled to invoke abandonment under the first prong; he never advised other members of the New Jersey crew of the Colombo crime family that he was abandoning the enterprise.

Nor is defendant entitled to invoke the second prong of the test. At the time of his guilty plea, defendant steadfastly refused to provide any information to law enforcement with respect to his participation in the conspiracy. He admitted to his individual acts only.

We have earlier set forth the critical distinction between a RICO conspiracy under *N.J.S.A.* 2C:41–2 and a conspiracy under *N.J.S.A.* 2C:5–2. In light of the ongoing nature of a RICO conspiracy, defendant's November 1995 guilty plea does not constitute a termination of the conspiracy by abandonment under *N.J.S.A.* 2C:5–2(f).

We note one final aspect related to defendant's argument that the trial court should have dismissed the charge of racketeering conspiracy as time-barred. He maintains that the evidence presented with respect to the racketeering charge was so pervasive and prejudicial that the jury could not fairly deliberate with respect to the second count of the indictment, the murder of Randazzo. The State notes that the authority on which defendant relies has been reversed. *United States v. Eppolito,* 436 *F.Supp.*2d 532 (E.D.N.Y.2006), *rev'd.,* 543 *F.*3d 25 (2d Cir.2008). More importantly, we have concluded that defendant's prosecution was timely, and thus his claim of unfair prejudice is unavailing.

Additionally, the State's theory and its proofs with respect to Randazzo's murder involved the alleged motive: that defendant, his brother, and Lombardino all acted to kill Randazzo out of fear that Randazzo was about to violate the oath of secrecy all had taken and reveal the activities of the enterprise. Proof of the racketeering conspiracy was inextricably intertwined with proof of the murder.

## VI.

We turn now to defendant's challenge to the trial court's instructions with respect to the charge on racketeering conspiracy. We note at the outset, however, certain fundamental principles that govern any analysis of a trial court's instructions to a jury. "An essential ingredient of a fair trial is that a jury receive adequate and understandable instructions. Correct jury instructions are at the heart of the proper execution of the jury function in a criminal trial." *State v. Afanador,* 151 *N.J.* 41, 54, 697 *A.*2d 529 (1997) (citations omitted) (internal quotation marks omitted).

Where the challenge to the court's instructions implicates only one portion of the charge, "[t]his court has repeatedly held that portions of a charge alleged to be erroneous cannot be dealt with in isolation but the charge should be examined as a whole to determine its overall effect." *State v. Wilbely,* 63 *N.J.* 420, 422, 307 *A.*2d 608 (1973). Our review, moreover, must not lose sight of

the distinction between instructions that are legally incorrect and those that are merely "capable of being improved." *State v. Delibero,* 149 *N.J.* 90, 106, 692 *A.*2d 981 (1997).

### A.

Defendant urges that the trial court erred when it instructed the jury, as we set forth above, that it had to "find beyond a reasonable doubt that the racketeering conspiracy did not terminate prior to January 2, 1998," and mentioned the State's assertion that Lombardino's refusal to testify in 2002 was an act committed in furtherance of the conspiracy. The instruction, he contends, permitted the jury to convict him for acts that occurred after the statute of limitations expired. We view this aspect of defendant's argument as yet another challenge to the timeliness of his prosecution. But, as we have set forth, we are satisfied that the prosecution was timely in all respects and that the jury instructions accurately set forth the law or the applicable statute of limitations. A conspirator, moreover, is liable for the acts of his co-conspirators, even if he is not aware of them. *N.J.S.A.* 2C:2–6(b).

Defendant requested that the trial court insert into this portion of its charge the qualifying language that the alleged overt act had to be one that "furthered the main objective of the conspiracy." The trial court declined to do so, and defendant argues that was error. We do not agree. Defendant's argument, in our judgment, again conflates a racketeering conspiracy with a conspiracy under *N.J.S.A.* 2C:5–2. Such language might be appropriate if defendant were charged with conspiring to commit specifically identified predicate acts. But, as we have pointed out, the charge against defendant encompassed much more.

### B.

Defendant also alleges that this portion of the trial court's charge was incorrect because it mixed together the statutory defenses of termination and abandonment under *N.J.S.A.* 2C:5–

2(f). He points to the following portion of the jury instruction: "I instruct you that a conspiracy is a continuing course of conduct which only terminates when the agreement to conduct the affairs of the racketeering enterprise through a pattern of racketeering activity is abandoned by the defendant and by those with whom he conspired." Defendant, however, was not entitled to the defense of abandonment, and, as we have explained, the instructions as a whole adequately conveyed the principle of termination to the jury. Thus, any possibility of confusion is irrelevant and not "clearly capable of producing an unjust result." *R.* 2:10–2.

### C.

Defendant also argues that the portion of the trial court's charge allegedly mixing termination and abandonment was incorrect because it imposed on him the burden of proving that he committed no act within the statutory five-year limit. For the reasons we have already set forth, we disagree.

The trial court outlined for the jury the necessity for it to conclude that an overt act occurred or that the conspiracy retained vitality after the operative date. Nothing within that language imposed any evidential burden upon defendant.

### D.

Defendant complains that the trial court erred in its instructions because it did not require the jury to determine unanimously that defendant agreed to the commission of two or more specific acts of racketeering. "The notion of unanimity requires 'jurors to be in substantial agreement as to just what a defendant did' before determining his or her guilt or innocence." *State v. Frisby,* 174 *N.J.* 583, 596, 811 *A.*2d 414 (2002) (quoting *United States v. Gipson,* 553 *F.*2d 453, 457 (5th Cir.1977)).

Ordinarily, a general instruction on the requirement of unanimity suffices to instruct the jury that it must be unanimous on whatever specifications it finds to be the predicate of a guilty verdict. There may be circumstances in which it appears that a genuine possibility of jury confusion exists or that a conviction may occur as

a result of different jurors concluding that a defendant committed conceptually distinct acts.

[*State v. Parker*, 124 *N.J.* 628, 641, 592 *A.*2d 228 (1991).]

In *Parker*, the Court provided examples of circumstances in which the general instruction that a verdict must be unanimous will not suffice. *See id.* at 635–37, 592 *A.*2d 228. Those circumstances include where: (1) a single crime could be proven by different theories supported by different evidence, and there is a reasonable likelihood that all jurors will not unanimously agree that the defendant's guilt was proven by the same theory; (2) the underlying facts are very complex; (3) the allegations of one count are either contradictory or marginally related to each other; (4) the indictment and proof at trial varies; or (5) there is strong evidence of jury confusion. *Frisby, supra,* 174 *N.J.* at 597, 811 *A.*2d 414 (quoting *Parker, supra,* 124 *N.J.* at 635–36, 592 *A.*2d 228). The general rule is that "in cases where there is a danger of a fragmented verdict the trial court must upon request offer a specific unanimity instruction." *Id.* at 597–98, 811 *A.*2d 414 (internal quotation marks omitted).

Applying the two-prong test enumerated in *Parker,* we first ask "whether the allegations in the [conspiracy] count were contradictory or only marginally related to each other." *Id.* at 639, 592 *A.*2d 228. All of the allegations against defendant arose from his affiliation with the New Jersey crew of the Colombo family and the activities that he undertook in furtherance of that illicit enterprise. Accordingly, the underlying actions were not "contradictory" and were much more than "marginally related to each other." *Ibid.* Thus, the first prong of the *Parker* test is satisfied.

Equally satisfied is the second prong of the *Parker* test: "whether there was any tangible indication of jury confusion." *Ibid.* The jury in this case, as in *Parker,* requested a recharge but did not indicate that it was confused or ask questions indicating confusion. *See ibid.* The jury was repeatedly told that its verdict had to be unanimous. Further, the trial included on the verdict sheet a question whether one of the predicate acts proven beyond a reasonable doubt was murder. The court stressed again the

need for unanimity in that portion of its charge to the jury. The second prong of *Parker* is satisfied, and a specific unanimity charge was not required in the context presented.

As we have emphasized, defendant was charged with RICO conspiracy. The jury did not have to find a specific agreement on his part to commit specific criminal acts. It need only have found that he agreed to join a RICO enterprise.

Because the test enunciated in *Parker* is satisfied in this case, and because the jury instructions, as a whole, presented a fair, clear, and accurate statement of the law, defendant's argument provides no basis to reverse his conviction.

## VII.

Defendant also asserts that the manner in which the trial court permitted the prosecution to establish during his 2004 trial that Lombardino had refused to testify during his 2002 trial violated his right of confrontation.

The Sixth Amendment to the United States Constitution provides, in part, that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." *U.S. Const.*, amend. VI. As this Court has observed, "the Confrontation Clause proscribes 'the use of out-of-court *testimonial* hearsay, untested by cross-examination, as a substitute for in-court testimony.'" *State v. Basil*, 202 *N.J.* 570, 591, 998 *A.*2d 472 (2010) (quoting *State ex rel. J.A.*, 195 *N.J.* 324, 342, 949 *A.*2d 790 (2008)). "[T]he ultimate goal of the Confrontation Clause is to test the reliability of testimonial evidence in 'the crucible of cross-examination.'" *Ibid.* (quoting *Crawford v. Washington*, 541 *U.S.* 36, 61, 124 *S.Ct.* 1354, 1370, 158 *L.Ed.*2d 177, 199 (2004)).

The central task when a violation of the Confrontation Clause is alleged is to determine whether the offending evidence was "testimonial" in nature. *See, e.g., J.A., supra*, 195 *N.J.* at 342–43, 949 *A.*2d 790.

"[W]itnesses against the accused," for Confrontation Clause purposes, are "those who bear testimony." [*Crawford, supra*, 541 *U.S.* at 61, 124 *S.Ct.* at 1364, 158 *L.Ed.*2d at 192.] In the constitutional sense, testimony is when "[a]n accuser ... makes a formal statement to government officers." *Ibid.* Out-of-court testimonial statements include affidavits, depositions, grand jury testimony, and "[s]tatements taken by police officers in the course of interrogations"—statements which, given the manner of their use in court, are the functional equivalent of testimony, but which have not been subjected to cross-examination. *Id.* at 51–52, 124 *S.Ct.* at 1362, 158 *L.Ed.*2d at 190.

[*Id.* at 342, 949 *A.*2d 790.]

Analysis of this aspect of defendant's argument requires that we set forth in some detail what occurred at defendant's second trial. Lombardino, who had refused to testify at defendant's first trial, was again produced at defendant's second trial, again questioned outside the presence of the jury, refused to answer questions, was granted immunity, continued in his refusal, and was again held in contempt. Because Lombardino was unwilling to provide testimony at the second trial, the prosecution called two witnesses who were present in the well of the courtroom at the time Lombardino refused to testify at defendant's first trial: Special Agent Stephen Kodak of the FBI and Sheriff's Officer Benjamin Rivera–Estrada. Kodak described what he saw on the date of Lombardino's first refusal, June 13, 2002:

When Mr. Lombardino was [led] into the courtroom he walked between the judge's bench and Mr. Cagno, looked over at Mr. Cagno, smiled at him. Mr. Cagno smiled back. Mr. Lombardino took the stand. Went through the proceedings there.
. . . .

After he was finished testifying, again, as he was being [led] out of the courtroom he had to walk between the judge's bench and where Mr. Cagno was seated.... While Mr. Lombardino gave a thumbs up sign to Mr. Cagno, said hang in there kid, smiled, winked, walked out of the courtroom, at the same time Mr. Cagno acknowledged that by smiling back.

Agent Kodak also testified that on the second date—June 18, 2002—on which Lombardino refused to testify, Lombardino again gave defendant a "thumb's up" sign as he was leaving the courtroom. Sheriff's Officer Rivera–Estrada, who was serving as courtroom security on June 18, 2002, also testified to the interaction—that Lombardino looked at defendant as he was leaving, "gave him kind of a small smile, wink and head nod with a thumbs

up sign" and basically uttered "keep your head up, kid .... or words to that effect." Defendant, in response, smiled and nodded his head. Neither witness mentioned to the jury that those events took place during defendant's first trial; the jury was kept unaware that defendant had been tried once for these offenses. They simply referred to "prior proceedings."

The testimony of Kodak and Rivera–Estrada indicating that Lombardino did not answer questions at the first proceeding is not "testimonial" for purposes of the Sixth Amendment for it did not relate an out-of-court statement by a declarant who was not available for cross-examination. The witnesses recounted to the jury their observations of Lombardino's conduct and gestures and were closely cross-examined as to their ability to make those observations. To the extent that such conduct and gestures were testimonial, statements of a co-conspirator in furtherance of the conspiracy are an exception to hearsay, and their admission does not violate the Confrontation Clause. *State v. Savage*, 172 *N.J.* 374, 402, 799 *A.*2d 477 (2002).

Defendant argued to the jury that the exchanges between defendant and Lombardino were of no moment while the State argued to the contrary. The interpretation was properly left to the jury.

One final observation must be made in connection with Lombardino's refusal to testify. Defendant's attorney noted when Lombardino refused to testify at defendant's second trial that he might wish to call Lombardino as a defense witness but was hampered by the provision in Lombardino's plea agreement stating that if Lombardino testified on behalf of defendant, the government could reinstate the murder charge against Lombardino that had been dismissed as part of his plea bargain. The colloquy that occurred when defense counsel made that observation makes clear that defendant suffered no prejudice because that provision of the plea bargain had been struck earlier. The prosecutor noted that it had been made "absolutely abundantly clear to Mr. Lombardino through his counsel ... that the conditions as set forth ... [were]

no longer binding and that Mr. Lombardino should feel free to testify without any possible sanctions should he testify one way for the State or another way for the defense." The prosecutor also referred to a letter that had been sent to Lombardino's attorney "to formalize the agreement of the U.S. Attorney's Office for the District of New Jersey to release Salvatore Lombardino" from the restriction contained in the 1994 plea agreement. Thus, to the extent defendant seeks to imply that there was something fundamentally unfair about producing Lombardino because he could not give testimony favorable to defendant without subjecting himself to a murder prosecution, that contention is unsupported by the record.

## VIII.

 Defendant complains that the trial court erred when it did not include the lesser-included offense of conspiracy to commit murder as part of its instructions with respect to count two of the indictment.

*N.J.S.A.* 2C:1–8(e) directs that a trial court "shall not charge the jury with respect to an included offense unless there is a rational basis for a verdict convicting the defendant of the included offense." This Court has long interpreted the statute's directive as requiring satisfaction of a two-part test:

> For a trial court to charge a jury on an unindicted offense, the court must conclude not only that the offense is included in the charged offense but also that the evidence at trial presents a rational basis for the jury to acquit the defendant of the greater offense and convict him or her of the lesser.
>
> [*State v. Brent,* 137 *N.J.* 107, 123, 644 *A.*2d 583 (1994).]

In *State v. Cassady,* 198 *N.J.* 165, 966 *A.*2d 473 (2009), we said that " 'whether an included offense charge is appropriate requires (1) that the requested charge satisfy the definition of an included offense set forth in *N.J.S.A.* 2C:1–8(d), and (2) that there be a rational basis in the evidence to support a charge on that included offense.' " *Id.* at 178, 966 *A.*2d 473 (quoting *State v. Thomas,* 187 *N.J.* 119, 131, 900 *A.*2d 797 (2006)).

In the present case, it is not disputed that conspiracy to commit murder is a lesser-included offense of murder. *See* *N.J.S.A.* 2C:1–8(d)(2) ("A defendant may be convicted of an offense included in an offense charged whether or not the included offense is an indictable offense. An offense is so included when ... [i]t consists of an attempt or conspiracy to commit the offense charged or to commit an offense otherwise included therein...."). Accordingly, the only question remaining is whether there was "a rational basis in the evidence to support a charge" on conspiracy to commit murder. *Cassady, supra,* 198 *N.J.* at 178, 966 *A.*2d 473 (quoting *Thomas, supra,* 187 *N.J.* at 131, 900 *A.*2d 797 (2006)); *accord State v. Brent,* 137 *N.J.* 107, 113–14, 644 *A.*2d 583 (1994).

Our review of the record convinces us that there was no such rational basis to support a conspiracy instruction. First, it is clear that, to the extent there was a conspiracy to murder Randazzo, the conspiracy was consummated when Randazzo was murdered as planned. Because "[a] person is legally accountable for the conduct of another person when ... he is engaged in a conspiracy with such other person[,]" *N.J.S.A.* 2C:2–6(b)(4), defendant would have been guilty of murder even if he had not been present at the scene. Second, the State's entire case was driven by the evidence of defendant's presence and actual participation in the murder of Randazzo. There would have been no "rational basis" upon which the jury could conclude that defendant conspired to murder Randazzo without holding him guilty for Randazzo's murder.

IX.

Defendant's final argument involves his sentence. He argues that the trial court erroneously treated his conviction under count one as a first-degree offense. He maintains that he should have been sentenced for a second-degree crime. The essence of defendant's challenge for this issue is that there is no such crime as first-degree racketeering conspiracy. He relies on *N.J.S.A.* 2C:5–4, which states that a "conspiracy to commit a crime of the first degree is a crime of the second degree."

We turn to the penalties provision of New Jersey's RICO Act because "[w]hen we examine a statute, 'our goal is to discern and effectuate the Legislature's intent. [Thus, t]he plain language of the statute is our starting point.'" *Hupka, supra,* 203 *N.J.* at 231, 1 *A.*3d 640 (quoting *Patel v. N.J. Motor Vehicle Comm'n,* 200 *N.J.* 413, 418, 982 *A.*2d 445 (2009)).

At the time of defendant's 2004 conviction, the penalties provision of the New Jersey RICO Act provided that:

> Any person who violates any provision of *N.J.S.* 2C:41–2 in connection with a pattern of racketeering activity which involves a crime of violence, the lesser-included offense of conspiracy to commit murder a crime of the first degree, or the use of firearms shall be guilty of a crime of the first degree. All other violations of *N.J.S.* 2C:41–2 shall be crimes of the second degree.
>
> [*N.J.S.A.* 2C:41–3(a).]

The crime of racketeering conspiracy appears at *N.J.S.A.* 2C:41–2(d) and is therefore embraced by that penalty provision. Applying the plain language of the RICO penalty provision, if the pattern of racketeering activity involves crimes of violence or firearms, the racketeering conspiracy is of the first degree.

Here, the jury explicitly found that at least one of the racketeering acts about which defendant conspired was murder and simultaneously convicted defendant of the Randazzo murder, which was perpetrated through the use of a firearm. Thus, his conviction meets both of the criterion for elevating his racketeering conspiracy to the first degree.

As that application shows, the plain language of the penalty provision is clear, and where the legislative intent is plainly expressed by the language of the statute, resort to extrinsic sources is not permissible to create ambiguity. *See Richardson v. Bd. of Trs., Police & Firemen's Ret. Sys.,* 192 *N.J.* 189, 195, 927 *A.*2d 543 (2007) ("If the plain language leads to a clear and unambiguous result, then our interpretive process is over."). For that reason, defendant's objection that the Appellate Division failed to consider the legislative history he advanced is unavailing.

Defendant's argument that the State exclusively has indicted racketeering conspiracy as a second-degree offense is also unavail-

ing. *State v. Taccetta,* 301 *N.J.Super.* 227, 693 *A.*2d 1229 (App. Div.1997), advanced by defendant, involved an indictment for second-degree racketeering conspiracy, but the question of whether the offense charged in *Taccetta* was correctly graded was not presented to this Court, and the result in that case cannot control our analysis here. The same holds true for *State v. Casilla,* 362 *N.J.Super.* 554, 829 *A.*2d 1095 (App.Div.), *certif. denied,* 178 *N.J.* 251, 837 *A.*2d 1093 (2003), also advanced by defendant. Further, it cannot be determined from that case which of the many actions attributed to defendant were alleged to constitute a "pattern of racketeering activity."

Because defendant presents no compelling reason to deviate from the plain language of the legislative scheme and the established canons of statutory construction that operate against the argument he advances, we are satisfied that the trial court properly upheld the indictment for first-degree racketeering conspiracy and that the Appellate Division properly affirmed his conviction and resultant sentence.

## X.

The following observations are in order in light of the views expressed by the dissent. In our opinion, we have analyzed the totality of the evidence that the prosecution presented against defendant. We have determined that a reasonable jury could conclude from that totality that defendant's membership in the RICO enterprise continued into the applicable limitations period. We should not be misunderstood as having held affirmatively that the silence of a witness could be held against a defendant.

The dissent views the government's evidence as so many separate threads and analyzes one of those threads in isolation. The evidential strands, however, woven together, comprise the completed fabric, and in our opinion, we have stressed the totality of those strands. The dissent, by focusing on only one narrow aspect of the government's entire case, does not reflect that entire picture.

## XI.

Defendant's convictions and sentence are affirmed.

Justice ALBIN, dissenting.

Defendant Aurelio Ray Cagno, a reputed member of the criminal organization La Cosa Nostra (LCN), was charged in a January 2003 Monmouth County indictment with the 1993 murder of James Randazzo, *N.J.S.A.* 2C:11–3(a)(1) and (2), and with first-degree racketeering conspiracy, *N.J.S.A.* 2C:41–2(c).[1] Whereas murder has no statute of limitations, *N.J.S.A.* 2C:1–6(a)(1), racketeering conspiracy has a five-year limitation period, *N.J.S.A.* 2C:1–6(b)(1). At defendant's 2004 trial, the State had to prove that defendant was involved in a RICO conspiracy within the five-year period before the return of the indictment. To ensure that the statute of limitations had not lapsed on the RICO conspiracy, the State presented a staged courtroom event from defendant's 2002 trial on a predecessor indictment that had ended in a mistrial.

At defendant's 2002 trial, the State placed on the stand Salvatore Lombardino, a then incarcerated organized-crime member and defendant's purported cohort. The State knew that Lombardino would not testify, even if ordered to do so. As expected, Lombardino refused to testify. In addition, Lombardino made several friendly gestures toward defendant, whom he had known for several decades.

At defendant's 2004 trial, the court permitted the State to introduce Lombardino's 2002 courtroom silence and gestures as evidence that, even then, he and defendant were involved in a conspiracy to cover up their alleged prior misdeeds. By this reckoning, Lombardino always could be counted on to extend the conspiracy—place him on the stand, he remains silent, and the clock is revived.

---

[1] The racketeering conspiracy charge finds its source in the New Jersey Racketeer Influenced and Corrupt Organizations Act (RICO), *N.J.S.A.* 2C:41–1 to –6.2.

I believe that the introduction of this evidence to manipulate an extension of the statute of limitations period on the racketeering conspiracy charge violated several principles of law. First, Lombardino's silence on the stand should not have been admissible as evidence of defendant's guilt. Second, the introduction of this evidence violated defendant's constitutional right of confrontation. Lombardino's refusal to testify precluded defendant from cross-examining Lombardino and having him explain the reasons for his silence and gestures. Third, Lombardino's silence on the stand and the friendly gestures did not constitute a co-conspirator's statement falling within the co-conspirator's exception to the hearsay rule. Last, Lombardino's silence and gestures demonstrate only Lombardino's state of mind, which cannot be imputed to defendant.

Prosecuting purported members of organized crime is an important objective of law enforcement, but suspending constitutional protections and our rules of evidence to do so undermines the integrity of the criminal justice process. That is too high a price to pay to obtain a conviction. I therefore respectfully dissent.

## I.

### A.

At defendant's 2004 trial, the court charged the jury that the State could not prosecute defendant on the RICO charge unless the conspiracy had continued past January 2, 1998. The jury was told that the State had to prove beyond a reasonable doubt *"an overt act* in furtherance of the conspiracy or *some other evidence* of the vitality of the conspiracy after January 2." (Emphasis added). The court instructed the jury that the State had alleged five overt acts, only two of which occurred after January 2, 1998. Those two overt acts concerned Lombardino's refusal to testify and his gestures at defendant's June 2002 murder and racketeering conspiracy trial. Beyond Lombardino's refusal to testify at that trial, the State did not present any evidence of defendant's

conduct after January 2, 1998 that would have supported defendant's participation in a conspiracy. Although instructed that the alleged conspiracy "only terminate[s] when the agreement to conduct the affairs of the racketeering enterprise through a pattern of racketeering activities is abandoned by the defendant and by those about with whom he conspired," the jury was reminded that the State was required to "prove beyond a reasonable doubt that the conspiracy continued after January [2], 1998."

### B.

The State offered the testimony of two witnesses to describe what occurred when Lombardino was called to the stand on June 13 and 18, 2002. On June 13, as Lombardino came into the courtroom, he smiled at defendant, and defendant smiled back. While on the stand, Lombardino, who had been granted immunity, was asked questions about the Randazzo murder. He refused to answer, even after the entry of an order compelling him to do so. After Lombardino left the stand, as he passed in front of defendant, "he gave a thumbs up sign and said hang in there kid." Lombardino smiled and winked at defendant, who then smiled back.

On June 18, Lombardino was brought back into the courtroom and again refused to testify. As he was exiting the courtroom, Lombardino "looked over at [defendant], gave him kind of a small smile, wink and head nod with a thumbs up sign. And basically uttered ... keep your head up, kid. Keep it up, kid or words to that effect." Defendant looked up, smiled, and gave a "small nod."

The State argued that Lombardino's June 2002 refusal to testify, gestures, and remarks were evidence that the racketeering conspiracy continued after January 2, 1998, and therefore the prosecution was not foreclosed by the statute of limitations. The State asserted that Lombardino's silence was a display of loyalty to LCN and of his solidarity with defendant, and evidenced that the racketeering conspiracy was ongoing—even in the courtroom.

That argument, however, cannot surmount constitutional and evidential barriers.

## II.

### A.

First, Lombardino's courtroom *silence* should not have been admissible against defendant to prove an ongoing conspiracy. Just as it is clear that the State cannot use a defendant's failure to testify as evidence of his guilt, *Griffin v. California*, 380 *U.S.* 609, 613–15, 85 *S.Ct.* 1229, 1232–33, 14 *L.Ed.*2d 106, 109–10 (1965), neither can the State tell the jury to infer a defendant's guilt from a witness's refusal to testify. In *State v. Burns*, we held that a trial court must instruct the jury not to draw any inferences, for or against a defendant, even when a witness's refusal to testify is not justified by any privilege. 192 *N.J.* 312, 333, 334–35, 929 *A.*2d 1041 (2007). The problem with silence is that it can be "insolubly ambiguous," and therefore to draw any negative inference, particularly when the witness is not subject to cross-examination, is inherently unfair. *Cf. State v. Lyle*, 73 *N.J.* 403, 410, 375 *A.*2d 629 (1977) (" '[E]very postarrest silence is insolubly ambiguous because of what the State is required to advise the person arrested.' " (quoting *Doyle v. Ohio*, 426 *U.S.* 610, 617, 96 *S.Ct.* 2240, 2244, 49 *L.Ed.*2d 91, 97 (1976))).

Lombardino was not called at defendant's 2004 trial; the State admittedly had no expectation that Lombardino would testify. But, by the State's logic, Lombardino could have been called to the stand if only so his refusal could be used as evidence that the conspiracy was ongoing and therefore the statute of limitations continued to run.

At oral argument before this Court, the State acknowledged that when it put Lombardino on the stand in June 2002, it had no expectation that he would testify given that he had refused to do so in the past. In essence, Lombardino became a convenient prop

for the State—a silent figure plopped on the stand, who always would serve the purpose of extending the statute of limitations.

The inference drawn from his silence was clearly used to add "critical weight" to the State's case—and without affording defendant the opportunity for cross-examination. *See Burns, supra,* 192 *N.J.* at 333–34, 929 *A.*2d 1041 (noting that reversal is warranted if " 'inferences from a witness' refusal to answer added critical weight to the prosecution's case in a form not subject to cross-examination' " (quoting *Namet v. United States,* 373 *U.S.* 179, 187, 83 *S.Ct.* 1151, 1155, 10 *L.Ed.*2d 278, 284 (1963))). The Confrontation Clause bars "admission of an out-of-court 'testimonial' statement permitted by state hearsay rules, *unless* the person who made the statement is unavailable to testify at trial and the defendant had a prior opportunity to cross-examine that person." *State ex rel. J.A.,* 195 *N.J.* 324, 328, 949 *A.*2d 790 (2008) (citing *Crawford v. Washington,* 541 *U.S.* 36, 50–52, 124 *S.Ct.* 1354, 1363–64, 158 *L.Ed.*2d 177, 192–93 (2004)). Defendant never had the opportunity to cross-examine Lombardino, either before or during his 2004 trial.

### B.

Although Lombardino's silence, gestures, and off-hand remarks were used against defendant, evidently in violation of defendant's confrontation rights, the majority disposes of this issue by finding that "[t]o the extent that such conduct and gestures were testimonial, statements of a co-conspirator in furtherance of the conspiracy are an exception to hearsay, and their admission does not violate the Confrontation Clause." *Ante* at 520, 49 *A.*3d at 407. Lombardino's gestures and remarks, however, clearly do not fit within the co-conspirator hearsay exception.

Under *N.J.R.E.* 803(b)(5), a *statement* is not excluded by the hearsay rule if it was "made at the time the party and the declarant were participating in a plan to commit a crime or civil wrong and ... made in furtherance of that plan." A co-conspira-

tor's statement is admissible pursuant to *N.J.R.E.* 803(b)(5) when the State establishes that (1) the statement was " 'made in furtherance of the conspiracy' "; (2) the statement was " 'made during the course of the conspiracy' "; and (3) there is " 'evidence, independent of the hearsay, of the existence of the conspiracy and [the] defendant's relationship to it.' " *State v. Taccetta*, 301 *N.J.Super.* 227, 251, 693 *A.*2d 1229 (App.Div.) (quoting *State v. Phelps*, 96 *N.J.* 500, 509–10, 476 *A.*2d 1199 (1984)), *certif. denied*, 152 *N.J.* 188, 704 *A.*2d 18 (1997).

First, the majority does not explain how Lombardino's *silence* on the stand can constitute a *statement* for purposes of the co-conspirator exception to the hearsay rule. Under our hearsay rules, a "statement" is defined as "(1) an oral or written assertion or (2) nonverbal conduct of a person if it is intended by him as an assertion." *N.J.R.E.* 801(a)(1). No case to my knowledge suggests that refusing to testify—silence—is the type of nonverbal conduct that would constitute a "statement" by a witness that can be used to impute guilt to a defendant.

Second, while the State presented independent evidence to demonstrate that defendant participated in a racketeering conspiracy in the 1980s and early-to-mid 1990s, Lombardino's courtroom appearance in June 2002 was the only specific evidence offered in support of an ongoing conspiracy after January 2, 1998. It bears mentioning that, as of June 2002, both Lombardino and defendant had been incarcerated for more than five years.[2] By the time

---

[2] On October 4, 1994, Lombardino pleaded guilty in federal court to conspiracy to commit murder in aid of racketeering and other charges concerning Randazzo's death. On February 1, 1995, he was sentenced to 204 months in prison. He was released on December 10, 2009. *See* Inmate Locator, *Fed. Bureau of Prisons,* http://www.bop.gov/iloc2/LocateInmate.jsp (last visited July 30, 2012).

On November 27, 1995, defendant pleaded guilty in federal court to conspiracy to commit murder in aid of racketeering in connection with Vincent Angellino's death. He was sentenced on January 31, 1997 to sixty months in prison. Defendant was released from federal prison on February 4, 2000. After just twenty days on supervised release, he was incarcerated in the Monmouth County

defendant stood trial in 2004, they had each been incarcerated for over seven years. While defendant's status as an inmate is not conclusive proof that he was no longer involved in the conspiracy, the burden remained on the State to present some proof that he was.

Even federal courts that presume a defendant continues in a RICO conspiracy until he proves otherwise, *see, e.g., United States v. Yannotti,* 541 *F.*3d 112, 123 (2d Cir.2008), have required *some* evidence of the conspiracy's continued existence during a long period of incarceration, *see, e.g., United States v. Morales,* 185 *F.*3d 74, 80–81 (2d Cir.1999).[3] That evidence need not be much. For example, the State could have offered evidence to show that defendant communicated with members of LCN while he was incarcerated. *See, e.g., United States v. Perez–Guerrero,* 334 *F.*3d 778, 781–82 (8th Cir.2003) (describing evidence, including letter from defendant to co-conspirator, which demonstrated that defendant continued to direct operations of drug ring while imprisoned). Alternatively, the State could have offered proof that defendant took steps before his incarceration to protect his stake in the enterprise or provide for its continued operation. *See, e.g., United States v. Agueci,* 310 *F.*2d 817, 839 (2d Cir.1962) (describing evidence that defendant designated specific individuals "to look after his interest in the conspiracy after his incarceration").

Here, however, the State offered no proof that defendant had contact with Lombardino or any other member of LCN during that time. In short, the State did not offer any evidence to

----

Correctional Institution for the present offense, where he remained until he was convicted and sentenced to state prison.

[3] In *Morales,* the Second Circuit reversed the defendants' conviction for a RICO conspiracy due to the "dearth of evidence" that the conspiracy "continued during the seven-year period that the defendants were incarcerated." 185 *F.*3d at 81. In particular, the *Morales* court noted that the government failed to "even establish that the defendants ever called one another or a mutual contact while in prison." *Ibid.*

suggest that defendant played any role in the conspiracy during his seven years of incarceration before his 2003 indictment.

To say that the mere existence of LCN, without more, is proof beyond a reasonable doubt that defendant continued to conspire from his jail cell past January 2, 1998 stretches conspiracy law beyond its recognized boundaries. Therefore, because the co-conspirator exception requires that the statement be made during the course of the conspiracy, and Lombardino's "statement" itself is the only evidence that the conspiracy existed at that point in time, it cannot be admitted under the co-conspirator exception.

## C.

Last, by imputing Lombardino's courtroom silence as evidence of defendant's guilt, the State, in essence, is improperly conflating Lombardino's state of mind with that of defendant. Lombardino's state of mind cannot be imputed to defendant under *N.J.R.E.* 803(c)(3). *See State v. McLaughlin,* 205 *N.J.* 185, 210–11, 14 *A.*3d 720 (2011). The State presented no evidence that defendant had any control over Lombardino's assertion of silence.

During summation, the State described Lombardino's gestures and remarked that, taken in context, "at the very minimum it shows that Lombardino is perpetuating the rules of [LCN]." Realistically, that is all it can show, for the State did not show that defendant had any control over Lombardino's behavior. Is the evidence of the conspiracy that defendant smiled back at Lombardino, a friend whom he had not seen in years? Was defendant required to sit stone-faced whenever Lombardino entered or left the courtroom, lest any reaction at all be construed as evidence of a conspiracy? The use of these instinctive, non-culpable human reactions to prove guilt is very troubling.

## III.

Lombardino's courtroom silence and gestures on June 13 and 18, 2002 should not have been admitted at defendant's trial.

Because the jury was not required to indicate how it came to the conclusion that the conspiracy fell within the statute of limitations, we cannot know whether the improper use of Lombardino's courtroom appearance proved to be the critical piece of evidence in convicting defendant.

I conclude that defendant's conviction was procured by improper means. I therefore respectfully dissent.

*For affirmance*—Justices LaVECCHIA, HOENS, PATTERSON and Judge WEFING (temporarily assigned)—4.

*For reversal*—Justice ALBIN—1.

*Not Participating*—Chief Justice RABNER.