**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3708-15T2

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

STEVEN P. RINCK,

    Defendant-Appellant.

_____

Argued April 12, 2018 — Decided July 23, 2018

Before Judges Simonelli, Rothstadt and Gooden Brown.

On appeal from Superior Court of New Jersey, Law Division, Monmouth County, Indictment No. 13-02-0373.

Elizabeth C. Jarit, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Elizabeth C. Jarit, of counsel and on the briefs).

Lisa Sarnoff Gochman, Assistant Prosecutor, argued the cause for respondent (Christopher J. Gramiccioni, Monmouth County Prosecutor, attorney; Lisa Sarnoff Gochman, of counsel and on the brief).

PER CURIAM

A jury convicted defendant Steven Rinck, a former police confidential informant (CI), of kidnapping, robbery and other crimes he committed while posing as a law enforcement officer and threatening two of his victims at gunpoint. The trial court imposed an aggregate extended-term sentence of twenty years, subject to a No Early Release Act (NERA), N.J.S.A. 2C:43-7.2, eighty-five percent period of parole ineligibility.

On appeal from his conviction and sentence, defendant argues that he was denied a fair trial due to the trial court's (1) denial of his discovery motions; (2) violation of his right to a speedy trial; (3) failure to give a limiting instruction about defendant's prior involvement with guns; (4) failure to sever the trial of the charges against him; and (5) errors in the court's jury instructions relating to the kidnapping charges made against him. He also argues that his sentence was excessive. For the reasons that follow, we affirm.

I.

The salient facts established at defendant's trial are summarized as follows. Prior to the day defendant committed the subject crimes, he had been a CI for the New Jersey State Police (NJSP), working with its weapons trafficking unit under the direction of Sergeant Michael Gregory. When he became a CI in 2011, defendant signed an agreement stating, among other

restrictions, that as a CI he could only work under the direct supervision of an officer, could not represent himself as a police officer to others, and could be charged with a crime if he posed as a police officer or committed any other illegal offense. Neither Gregory nor any other police officer were involved with defendant's actions that led to the charges brought against him in this case, nor were there any active investigations involving defendant at the time.

On or before October 21, 2012, defendant spoke with Bhadresh Patel, the owner of a car wash that defendant frequented. Defendant had represented to Patel that he was a retired police officer, which Patel believed as he had seen defendant wearing a badge. Defendant asked Patel if he could use his car, as defendant's car was not working, and he needed a car to drive to a wedding. Because Patel trusted defendant as a police officer, he gave him his car.

On October 21, 2012, defendant was driving Patel's vehicle when he claimed he saw twenty-two-year-old Aaron Waldron selling marijuana from his home. Defendant parked the car and knocked on Waldron's apartment door. Waldron believed his friend Thomas Pastor was at the door. However, when he opened the door, he found defendant, wearing a black leather jacket, a green shirt with "Sheriff" written across the front, a five-point star badge

hanging around his neck and a gun in his belt. While holding a white piece of paper with a purple stripe on it, defendant told Waldron that he worked for the Monmouth County Sheriff's Department, and that he had a warrant to search the apartment.

As defendant entered, he told Waldron that he had observed someone purchasing drugs from the apartment and that Waldron could be arrested for drug distribution, but could avoid arrest if he "snitch[ed] on drug dealers and people who were selling guns[.]" Defendant asked Waldron to turn over any drugs in his possession, and Waldron gave him a few small bags of marijuana.

While defendant was confronting Waldron, Pastor knocked on the door, which defendant answered by opening the door and pointing his handgun at Pastor, telling him to "[c]ome in and shut [his] mouth[.]" Defendant identified himself as "Officer Rinck[,]" and told Pastor that he was "guilty by association." When Pastor questioned why he was in trouble, defendant threatened to shoot Pastor and Waldron as well for not "keep[ing Pastor] in line[.]" Defendant told Pastor "[y]ou move one inch, I'll pop a cap in your ass."

Defendant told Waldron and Pastor to empty their pockets, and took their cell phones, $40 and a hunting knife from Waldron, as well as $480 from Pastor. Defendant told the two men "to set up one of [their] friends so [that] he can get a larger score on the

4                                          A-3708-15T2

night[,]" because he did not want to waste the taxpayers' money. He gave back to Waldron his cell phone so that he could call a drug dealer.

Waldron began to suspect that defendant was not a real police officer. When defendant gave him his cell phone, Waldron did not call a drug dealer, but instead called his friend Renee Paglia in an effort to tip her off that something was wrong. Paglia found the call "unusual" because Waldron was talking about selling drugs and she was not a dealer. She told Waldron to call a mutual friend that he knew sold marijuana.

Defendant brought Waldron and Pastor outside and directed them into Patel's car. Although the vehicle was obviously not a police car, and despite not wanting to get into the car, Waldron and Pastor cooperated because defendant had a gun that he used to threaten Pastor if he did not get into the car.

Defendant drove toward Paglia's house. Pastor started "freaking out because [he] knew something wasn't right" and asked defendant to take him to the local police station because he would "rather just get charged." Defendant instead dropped Pastor off at the corner of the street, leaving him without his cell phone because Pastor "was going to interrupt [the] investigation[.]" Defendant and Waldron continued driving to Paglia's house.

When the two men arrived, Paglia's adult daughter let them into the apartment. Defendant walked directly to Paglia's bedroom, still wearing, according to Paglia, "a badge around his neck [that looked like a s]ilver star like an officer would wear" and "a gun . . . on his waist [that h]e had . . . sticking out [of] his pants [to make] sure that [she] knew that he had one." Defendant told Paglia that he was a police officer, and asked her where the drugs were located. Paglia stated that defendant was antsy and "just couldn't stand still," which made her suspect that he was not a real police officer. She told defendant that she did not have any drugs, but knew someone she could call to get some. Paglia called her boyfriend to "waste some time[,]" and then told defendant she could not get the drugs. Defendant asked Paglia, "Why [she had] waste[d his] time . . . ?" He threatened to call more police officers to search her house and child welfare authorities because there were children in the home. Defendant and Waldron then left together.

Defendant drove Waldron back to his apartment, and told him that if he helped him set up "a gun or heavier drug bust that" Waldron would not be in trouble. He gave Waldron his cell phone number, stated his name was "Steve[,]" and told Waldron to call him in the morning. Before leaving, defendant returned Waldron's

and Pastor's cell phones, but kept the cash, hunting knife, and small bags of marijuana.

Waldron went to Pastor's home and returned Pastor's cell phone to Pastor's mother, Dawn Pastor. According to Dawn,[1] after hearing Waldron and her son's account of what happened, she realized that defendant was not a police officer. She called the number that defendant had provided to Waldron and asked defendant for her son's money back. Defendant refused and said Pastor was "guilty by association and he's not getting his money back."

After dropping Waldron off, defendant texted Gregory. According to Gregory, at 9:50 p.m., defendant texted him that "[w]e got something big time [and c]all me tomorrow." In response to Gregory's text inquiring what defendant was talking about, defendant told Gregory to call him. Gregory called defendant, who excitedly told him, "Yo, I ran up in this f'rs house. We got something. He brought me to a gun connect." When Gregory again asked defendant what he was talking about, defendant told him that he was "just messing around [and to g]ive [him] a call tomorrow."

The next morning, Waldron and Pastor went to the local police department and gave formal statements to Detective Bryan King and Officer Justin Cocuzza. Cocuzza called the number defendant had

---

[1] We refer to her by her first name to avoid any confusion.

given to Waldron and, while the call was being recorded, questioned defendant about the events that took place the night before. During the call with Cocuzza, defendant told a different version of the night's events than the statements given by Waldron and Pastor.

Defendant stated:

> I had my daughter and I saw the whole thing go down. I saw the guy come out of the car and go into this guy -- this big guy's house. Two big guys. And they were outside and they were selling drugs. They were selling weed. So I said "What the fuck's going on?" . . . .
>
> They said "Oh no, no, nothing, nothing, nothing." So I kind of scared them a little bit, because I -- I'm -- you know, I'm a scary -- you know, I'm not -- not a tough guy, but I said "What's going on? What do you got?"
>
> So, of course, they threw it all out. They -- they showed me what they had. They had bags of weed and everything. I told them "Fucking get rid of it." I said "What the fuck's going on?" I said "Who are you?" They gave me their -- you know, they told me who they were. They were real scared, because they got busted. And then I -- I said "You know, you're in a school zone." I said "You know, you" -- I said, you know, "What the fuck's going on?"

After the phone call, defendant texted Gregory at 10:42 a.m., that "this kid from last night will work for you. . . . He's gonna set up the gun buys[.]" Two minutes later, defendant texted again stating, "Do you want to give . . . Det. King -- the drugs?"

Eleven minutes later, Gregory received another text from defendant, which stated:

> These two kids were selling dope. I called over and they rang. They rang like birds. I made them get rid of their shit. They thought I was DT. They thought I was a detective. I didn't -- anything. The one guy told me all about the guns and he wants to work. You need to come up with me later.

Gregory did not respond to any of these messages.[2] Prior to receiving defendant's text messages he spoke with King who asked if Gregory knew defendant. Gregory told King that defendant was a CI. However, Gregory maintained that he had not given defendant any authority to do what he had done the night prior.

Later that afternoon, King went to defendant's home to speak to defendant. Defendant's girlfriend answered the door and told him that defendant was at work. At King's request, defendant's girlfriend called defendant and handed the phone to King. King requested that defendant meet with him at the police headquarters after work, and defendant obliged.

---

[2] According to Gregory, the text messages were not preserved and could not be obtained from his phone because "they automatically delete." However, on January 9, 2014, Kaitlin Mantle, an expert in cell phone forensic analysis, examined defendant's phone, and was able to retrieve the incoming and outgoing calls, incoming text messages, outgoing text messages, SMS messages, and draft messages from defendant's phone.

At headquarters, the detective administered <u>Miranda</u>[3] warnings to defendant. In response, defendant indicated that he understood his rights, and signed a waiver that stated he was willing to waive his rights and speak to police.

In his statement to police,[4] defendant reiterated the same story he told to Cocuzza on the phone, and stated that he believed he was allowed to work undercover as a CI when he saw someone dealing drugs. He denied taking the marijuana, cash, or the knife, and claimed that he "made them flush" the drugs down the toilet. He also denied identifying himself as a police officer, wearing a Sheriff's shirt with a badge, carrying a gun, threatening to shoot anyone, or forcing anyone to get into his car. Defendant stated that he was texting Gregory as the events unfolded that night and that he was "recruiting[,]" and believed "that's what [he's] supposed to do is recruit." However, he conceded that he "overstepped [his] bounds[, that he] should have called the police[, and he] should have [done] the right thing[.]" "During his interrogation, defendant gave his written consent for the police to search the car he used, and claimed that the car belonged to his boss. He also consented to the officers searching his

---

[3]  <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).

[4]  A redacted recording of King's interrogation of defendant was played to the jury at trial.

A-3708-15T2

residence. Neither search resulted in discovery of a gun, the shirt that said "Sheriff" on it, badge, knife, or cash.

After speaking with defendant, King went to Paglia's house and asked her and her daughter, to speak to him at police headquarters. At headquarters, both women told him that defendant had a silver badge, and was carrying a gun.

Defendant was arrested that night, and signed a consent form for the police to search his cell phone.

On February 25, 2013, a Monmouth County Grand Jury returned indictment number 13-02-0373, charging defendant with four counts of fourth-degree impersonating a law enforcement officer, N.J.S.A. 2C:28-8(b) (counts one, two, thirteen and fourteen); two counts of first-degree armed robbery, N.J.S.A. 2C:15-1 (counts three and four); second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a) (count five); second-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b) (count six); two counts of fourth-degree aggravated assault by pointing a firearm, N.J.S.A. 2C:12-1(b)(4) (counts seven and eight); two counts of third-degree terroristic threats, N.J.S.A. 2C:12-3(a) (counts nine and ten); two counts of first-degree kidnapping, N.J.S.A. 2C:13-1(b) (counts eleven and twelve); and second-degree certain persons not to have weapons, N.J.S.A. 2C:39-7(b)(1) (count fifteen).

Defendant filed a motion seeking to compel the State to produce, among other items, all police reports involving investigations in which defendant was utilized as a CI by the NJSP or any other law enforcement agency. The court denied defendant's motion on July 21, 2014. On July 28, 2015, defendant filed a motion to dismiss the indictment based on speedy trial grounds, which the trial court denied on November 9, 2015.

Defendant's trial began on December 9, 2015,[5] and on December 24, 2015, defendant was convicted of all counts.[6] At sentencing, the court granted the State's motion to sentence defendant to a discretionary extended term as a persistent offender under N.J.S.A. 2C:44-3(a). The court merged counts five, seven, eight, nine and ten into counts three and four. On count three, the court sentenced defendant to twenty years in state prison subject to a NERA parole ineligibility period. The remaining custodial

---

[5] On the first day of trial, defendant renewed his motion to compel discovery of the police reports, which the trial court again denied.

[6] A bifurcated trial was held that day for the certain persons not to have weapons charge (count fifteen), and defendant was also convicted of that count.

sentences were imposed concurrent to count three.[7]  This appeal

followed.

On appeal, defendant specifically argues the following:

> POINT I
>
> THE PROSECUTOR'S WITHHOLDING OF
> RELEVANT DISCOVERY AND THE JUDGES'
> DENIALS OF RINCK'S DISCOVERY
> MOTIONS VIOLATED THE RULES OF
> EVIDENCE AND DEPRIVED RINCK OF DUE
> PROCESS, A FAIR TRIAL, THE
> OPPORTUNITY TO PRESENT A COMPLETE
> DEFENSE, AND THE RIGHT TO CONFRONT
> THE WITNESSES AGAINST HIM.
>
> A.   THE PROSECUTOR WAS REQUIRED TO
> DISCLOSE THE POLICE REPORTS
> PURSUANT TO RULE 3:13-3, BRADY[8], AND
> IN ORDER TO GUARANTEE RINCK HIS
> CONSTITUTIONAL RIGHTS.
>
> B.   THE COURT ERRED IN CONCLUDING
> THAT THE POLICE REPORTS WERE
> PRIVILEGED UNDER [N.J.R.E.] 515 AND
> 516.
>
> i.   THE STATE FAILED TO
> DEMONSTRATE THE DOCUMENTS WERE
> PRIVILEGED UNDER [N.J.R.E.] 515.

---

[7]   On counts one, two, thirteen and fourteen, defendant was sentenced to one year; on count four, defendant was sentenced to fifteen years subject to a NERA parole ineligibility period; on counts six, eleven and twelve, defendant was sentenced to seven years subject to a NERA parole ineligibility period; on count fifteen, defendant was sentenced to seven years with a five-year parole ineligibility period.

[8]   Brady v. Maryland, 373 U.S. 83, 87 (1963).

ii. [N.J.R.E.] 516 DOES NOT APPLY WHERE THE CI'S IDENTITY HAS ALREADY BEEN DISCLOSED.

C. ASSUMING ARGUENDO THAT THE POLICE REPORTS WERE PRIVILEGED, THE COURT WAS REQUIRED TO REVIEW THE DOCUMENTS [IN CAMERA] TO BALANCE THE NEED FOR CONFIDENTIALITY AGAINST RINCK'S CONSTITUTIONAL RIGHTS.

POINT II

THE [1144]-DAY DELAY IN BRINGING RINCK'S CASE TO TRIAL DENIED HIM OF THE CONSTITUTIONAL RIGHTS TO DUE PROCESS AND A SPEEDY TRIAL.

A. THE MORE THAN THREE-YEAR DELAY WAS EXTRAORDINARY.

B. NEARLY ALL OF THE DELAY WAS ATTRIBUTABLE TO THE STATE.

C. RINCK ASSERTED HIS RIGHT MONTHS BEFORE TRIAL.

D. RINCK SUFFERED SEVERE PREJUDICE FROM HIS PRETRIAL INCARCERATION, INCLUDING HOSPITALIZATION FROM HAVING BEEN BEATEN BECAUSE OF HIS STATUS AS A CI.

POINT III

FAILURE TO PROVIDE A LIMITING INSTRUCTION CONCERNING TESTIMONY THAT RINCK KNEW GUN TRAFFICKERS MEANT THAT THE JURY WAS PERMITTED TO RELY ON THIS TESTIMONY AS PROPENSITY EVIDENCE WHEN DETERMINING WHETHER RINCK POSSESSED A WEAPON. (Not raised below).

14

POINT IV

BECAUSE THE INDICTMENT CHARGED TWO SEPARATE AND UNRELATED CRIMINAL EPISODES, THE TRIAL COURT ERRED IN FAILING TO SEVER THE CHARGES. (Not Raised Below).

POINT V

BECAUSE THE JURY INSTRUCTIONS ON KIDNAPPING ALLOWED FOR A NON-UNANIMOUS VERDICT, THESE CONVICTIONS MUST BE REVERSED. (Not Raised Below).

POINT VI

THE CUMULATIVE IMPACT OF THE ERRORS DENIED RINCK DUE PROCESS AND A FAIR TRIAL. (Not Raised Below).

POINT VII

THE 20-YEAR SENTENCE WAS MANIFESTLY EXCESSIVE, REQUIRING A REMAND FOR RESENTENCING.

II.

We begin with defendant's contention that the trial court erred by denying his motions to compel the State to turn over copies of police reports from investigations in earlier, unrelated matters in which he allegedly participated as a CI.[9] In his pretrial motion, defendant argued that he needed the police reports

---

[9] During the motion hearing, the State expressed its concern that providing defendant with the discovery he sought could compromise the ongoing investigations in the cases that defendant was involved with as a CI.

because he "think[s]" he could use them to impeach Gregory's testimony at trial that the officer did not authorize defendant's actions on the night of October 21, 2012. Defendant did not file any certification or affidavit from himself or anyone else that indicated that Gregory or any other law enforcement officer authorized his actions either directly or indirectly. He conceded that his request "ha[d] no p[ara]meters, both as to time, location and the participants[,]" with its only limitation being cases that involved defendant as a CI, with "any . . . law enforcement agency[.]" Defense counsel argued that he wanted the reports to only look "for clues as to what [defendant] was doing, whether what he was doing reflected in those reports is consistent with the guidelines, the rules of engagement, or whether it's inconsistent[.]"

In a comprehensive eight-page written decision, the trial court denied defendant's motion. As a threshold matter, the court

found that pursuant to N.J.R.E. 515[10] and N.J.R.E. 516,[11] "[i]nformation in the possession of law enforcement officials concerning the existence or occurrence of alleged criminal activities is privileged." However, recognizing that "these privileges are not absolute[,]" it applied the proper analysis and determined that defendant failed "to justify [even] an [in camera] review of the reports [because h]e has proffered no evidence

---

[10] N.J.R.E. 515 provides:

> No person shall disclose official information of this State or of the United States (a) if disclosure is forbidden by or pursuant to any Act of Congress or of this State, or (b) if the judge finds that disclosure of the information in the action will be harmful to the interests of the public.

[11] N.J.R.E. 516 provides:

> A witness has a privilege to refuse to disclose the identity of a person who has furnished information purporting to disclose a violation of a provision of the laws of this State or of the United States to a representative of the State or the United States or a governmental division thereof, charged with the duty of enforcing that provision, and evidence thereof is inadmissible, unless the judge finds that (a) the identity of the person furnishing the information has already been otherwise disclosed or (b) disclosure of his identity is essential to assure a fair determination of the issues.

'tending to show the existence of the essential elements' of the defense of entrapment by estoppel." Citing Rule 1:6-6,[12] the court explained "[t]here is no . . . evidence . . . in the form of affidavit or certifications from defendant or anyone else, that any government official — whether Sergeant Gregory or someone else — actually authorized or condoned defendant engaging in the type of criminal conduct he is accused of committing." It further stated "[t]here is also no competent evidence before [the c]ourt 'that the documents in the government's possession would indeed be probative' of an entrapment by estoppel defense." The trial court also expressed its belief that the more appropriate course of action was for defendant to elicit on cross-examination testimony from Gregory concerning the possibility that he authorized defendant's actions.

---

[12] Rule 1:6-6 provides:

> If a motion is based on facts not appearing of record or not judicially noticeable, the court may hear it on affidavits made on personal knowledge, setting forth only facts which are admissible in evidence to which the affiant is competent to testify and which may have annexed thereto certified copies of all papers or parts thereof referred to therein. The court may direct the affiant to submit to cross-examination, or hear the matter wholly or partly on oral testimony or depositions.

When defendant renewed his motion after Gregory's testimony was taken, the court again denied the motion, noting that "nothing was said in testimony that would show that . . . Gregory . . . encouraged the defendant . . . to obtain information outside the rules, or that . . . Gregory had authorized the defendant to act beyond the rules of engagement." Reiterating its prior decision, the court observed that nothing in "the record made requires in fairness a different decision now."

On appeal, defendant maintains that the information was necessary so he could "present his defense [of entrapment] that he was acting based on directions from Gregory [and in order] to cross-examine Gregory on his assertion that he never encouraged this type of behavior." He argues that the State "was required to disclose the police reports pursuant to Rule 3:13-3, Brady, and in order to guarantee [his] constitutional rights." He further contends "[t]he court erred in concluding that the police reports were privileged under [N.J.R.E.] 515 and 516.[13]" Even if the reports were privileged, defendant asserts "the court was required to review the documents [in camera] to balance the need for

---

[13] We agree with defendant that the police reports were not privileged under N.J.R.E. 516 as defendant was the CI and his identity was already disclosed.

confidentiality against [defendant's] constitutional rights."  We disagree.

In our review of a trial court's resolution of a discovery issue, we afford the court substantial deference and will not overturn its decision "absent an abuse of discretion[,]" State v. Stein, 225 N.J. 582, 593 (2016) (citing State v. Hernandez, 225 N.J. 451, 461 (2016)), meaning that the decision is "well 'wide of the mark,' or 'based on a mistaken understanding of the applicable law[.]'"  Hernandez, 225 N.J. at 461 (citations omitted).  However, "[o]ur review of the meaning or scope of a court rule is de novo; we [will] not defer to the interpretations of the trial court . . . unless we are persuaded by [the trial court's] reasoning."  State v. Tier, 228 N.J. 555, 561 (2017) (citing Hernandez, 225 N.J. at 461).

Applying that standard, we conclude the trial court properly denied defendant's motion as he made no showing that the information he sought was relevant or that an in camera review of the police reports was warranted.  Defendant never certified that Gregory authorized or lured him into committing any of the subject offenses.  He also did not establish that information contained in the police reports relative to his earlier participation in prior unrelated criminal investigations could somehow prove that

he was entrapped[14] or that it exculpated him from a charged offense in this case. Thus, his reliance on Rule 3:13-3(b)[15] is inapposite. In order to be entitled to discovery, a defendant must "articulate[] how the disclosure of documents in the unrelated investigations will lead to relevant or admissible evidence." Hernandez, 225 N.J. at 466 (citing State v. Ballard, 331 N.J. Super. 529, 538 (App. Div. 2000)). Defendants cannot "undertake a speculative venture, hoping to snare some morsel of information that may be helpful to the defense." Ibid.

We also agree with the trial court's conclusion that, absent any showing by defendant that the documents would support his contention that he was entrapped, the requested documents remained privileged under N.J.R.E. 515 to the extent they related to any ongoing investigations. In order to have a court consider piercing a privilege, a defendant "must advance 'some factual predicate

---

[14] Entrapment exists when the criminal design originates with the police officials, and they implant in the mind of an innocent person the disposition to commit the offense and they induce its commission in order that they may prosecute. It occurs only when the criminal conduct was the product of the creative activity of law enforcement officials.

[State v. Dolce, 41 N.J. 422, 430 (1964) (citations omitted).]

[15] Rule 3:13-3(b) provides that "[d]iscovery shall include exculpatory information or material [as well as] relevant material[.]"

which would make it reasonably likely that the file will bear such fruit and that the quest for its contents is not merely a desperate grasping at a straw.'" State v. Harris, 316 N.J. Super. 384, 398 (App. Div. 1998) (citation omitted) (referring to police reports). Here, defendant failed to come forward with any proof, supporting his contention that his criminal behavior was authorized or encouraged by anyone or legally justified in reliance upon a law enforcement officer's conduct in the past. Under these circumstances, defendant was not entitled to any discovery of the unrelated police reports.

### III.

Turning to defendant's speedy trial argument, he contends his right to a speedy trial was violated when he was incarcerated for 1144 days before his trial began.[16] Defendant asserted his right to a speedy trial for the first time on July 25, 2015, when he filed his pre-trial motion.

The trial court found that there were "extensive delays early on in this matter" obtaining discovery, including "police reports and court records from another county[,]" and securing "data off . . . defendant's cell phone[.]" The court also explained that much of the delay was caused by "[t]he harsh reality of" the

---

[16] Defendant was arrested on October 22, 2012 and his trial began on December 9, 2015.

court's "very congested trial calendar" caused by the lengthy trials over which it presided.

On appeal, defendant asserts that "the court failed to conduct the required four-part balancing test articulated by <u>Barker v. Wingo</u>, 407 [U.S.] 514 (1972) [and i]nstead, . . . simply attributed the delay to the single motion for discovery and to the congestion of the court's calendar." Relying on <u>Doggett v. United States</u>, 505 U.S. 647, 652 n.1 (1992), although defendant does not claim the State intentionally delayed his trial, he argues that his "remain[ing] in jail for over three years awaiting his trial is extraordinary" and that "[n]early all of the delay was attributable to the State[,]" including the "justification of court congestion[.]" Last, he argues that he "suffered severe prejudice from his pretrial incarceration, including hospitalization from having been beaten because of his status as a CI." We are not persuaded by these arguments.

Our review of a trial court's speedy trial determination is limited. We will not overturn a trial judge's decision as to whether a defendant was deprived of due process on speedy-trial grounds unless the judge's ruling was clearly erroneous. <u>State v. Merlino</u>, 153 N.J. Super. 12, 17 (App. Div. 1977).

Contrary to defendant's contentions, we conclude that the trial court properly assessed defendant's arguments and there was no error in its denial of his motion.

"The right to a speedy trial is guaranteed by the Sixth Amendment to the United States Constitution and imposed on the states by the Due Process Clause of the Fourteenth Amendment." State v. Tsetsekas, 411 N.J. Super. 1, 8 (App. Div. 2009) (citing Klopfer v. North Carolina, 386 U.S. 213, 222-23 (1967)). "The constitutional right . . . attaches upon defendant's arrest." Ibid. (alteration in original) (quoting State v. Fulford, 349 N.J. Super. 183, 190 (App. Div. 2002)). Since it is the State's duty to promptly bring a case to trial, "[a]s a matter of fundamental fairness," the State must avoid "excessive delay in completing a prosecution[,]" or risk violating "defendant's constitutional right to a speedy trial." Ibid. (citing State v. Farrell, 320 N.J. Super. 425, 445-46 (App. Div. 1999)).

A defendant bears the burden of establishing a violation of his speedy trial right. State v. Berezansky, 386 N.J. Super. 84, 99 (App. Div. 2006). When determining whether a violation of a defendant's speedy-trial rights contravenes due process, "[c]ourts must consider and balance the '[l]ength of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant.'" Tsetsekas, 411 N.J. Super. at 8 (second

24

alteration in original) (quoting Barker, 407 U.S. at 530); see also State v. Szima, 70 N.J. 196, 200-01 (1976) (adopting the Barker analysis). "No single factor is a necessary or sufficient condition to the finding of a deprivation of the right to a speedy trial." Tsetsekas, 411 N.J. Super. at 10 (citing Barker, 407 U.S. at 533). Courts are required to analyze each interrelated factor "in light of the relevant circumstances of each particular case." Ibid. The remedy for violating the right to a speedy trial is dismissal of the indictment. Barker, 407 U.S. at 522.

Addressing the length of the delay under the four-part test, although "[t]here is no set length of time that fixes the point at which delay is excessive[,]" Tsetsekas, 411 N.J. Super. at 11, typically, once the delay exceeds one year, it is appropriate to engage in the analysis of the remaining Barker factors. State v. Cahill, 213 N.J. 253, 266 (2013). However, there is no bright-line test requiring dismissal after a specified period of delay. Id. at 270.

The "second prong examines the length of a delay in light of the culpability of the parties." Tsetsekas, 411 N.J. Super. at 12 (citing Barker, 407 U.S. at 531). "[D]ifferent weights should be assigned to different reasons" proffered to justify a delay. Barker, 407 U.S. at 531. Purposeful delay tactics weigh heavily against the State. Tsetsekas, 411 N.J. Super. at 12; Barker, 407

U.S. at 531. "A more neutral reason[,] such as negligence or overcrowded courts[,] should be weighted less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant." Barker, 407 U.S. at 531. "[A] valid reason, such as a missing witness, should serve to justify appropriate delay." Ibid. And, "[d]elay caused or requested by the defendant is not considered to weigh in favor of finding a speedy trial violation." Farrell, 320 N.J. Super. at 446 (citations omitted).

The third prong addresses the defendant's action in seeking a speedy trial. Although "[a] defendant does not have an obligation to . . . bring himself to trial[,]" Cahill, 213 N.J. at 266 (citing Barker, 407 U.S. at 527), a failure to timely assert the right is a factor to be considered in the assessment of an alleged speedy trial violation. Ibid.; see also Fulford, 349 N.J. Super. at 193 (finding defendant waited twenty-eight months to assert his right to a speedy trial).

Last, in addressing the fourth factor, prejudice to defendant, Barker, 407 U.S. at 530, the following three interests are considered: prevention of oppressive pretrial incarceration, minimization of defendant's anxiety concerns and whether the defense has been impaired by the delay. Id. at 532; Cahill, 213

N.J. at 266.  "Of these, impairment of the defense [is] considered the most serious since it [goes] to the question of fundamental fairness."  Szima, 70 N.J. at 201.

Here, there is no dispute that there was a delay in commencing defendant's trial.  Defendant does not contend, however, that the State intentionally delayed his trial or that his defense was impaired as a result of the delay.  Moreover, defendant waited over two years and nine months before he asserted his right.  When he did, the trial court properly recognized that some of the delay was necessary for the parties to obtain needed discovery and the trial was only otherwise delayed by the court's calendar.  Finally, defendant's claim that "he suffered particularly oppressive incarceration due to [the] physical violence inflicted on him [because he was a CI] in the jail, [which led] to his hospitalization[,]" does not tilt the scales sufficiently to find a speedy trial violation on the entire record.  While unfortunate, there is no proof that his treatment would have been different had his time in jail pretrial been shorter.  In any event, "where . . . defendant has not pointed to any evidence of additional, specific prejudice flowing from the delay, [a court should not] infer prejudice based on incarceration that the defendant would ultimately have had to serve[,]" especially where defendant receives all of the jail credit to which he is entitled for the

27

time spent awaiting trial.[17]  <u>Hakeem v. Beyer</u>, 990 F.2d 750, 762 (3d Cir. 1993).

The trial court correctly determined that despite the delay in bringing defendant to trial, he failed to establish any violation of his due process rights.  We have no cause to disturb his conviction.

## IV.

In Point III of his brief, defendant argues for the first time on appeal that the trial court erred by never instructing the jury on the proper use of Gregory's and another police witness' testimony that, prior to becoming a CI, defendant "was involved with gun traffickers[.]"  At trial, both Gregory and Detective Craig Pokrywa of the NJSP testified about defendant's involvement as a CI with gun traffickers initially in response to defense counsel's cross-examination.  For example, counsel specifically asked Pokrywa whether "it [was] fair to say that drug dealers oftentimes have information about weapons, securing handguns and things like that[,]" and since CIs "were encouraged to infiltrate criminal organizations[,]" whether their actions "might lead [them] to information about people who are selling guns."  On redirect, when the prosecutor asked about the types of criminal

---

[17]  Defendant received jail credit totaling 1264 days.

organizations a CI would be asked to infiltrate, the officer stated that they were "not going to just send [CIs] out and [have them] infiltrate something that they have no knowledge of[,]" and he confirmed that "the organization that they would actually be infiltrating is something that they already would know[.]"

Defense counsel asked Gregory similar questions on cross-examination about defendant's activities as a CI. In response, Gregory, too, initially confirmed that part of defendant's "duties under [his] supervision was to infiltrate criminal organizations[,]" and that defendant was involved in "gun cases[,]" but he clarified that defendant "didn't infiltrate a criminal organization. He had targets that were [their] suspects[.]" When asked if defendant "gained the confidence of" gun traffickers as part of his duties, Gregory assumed he did because defendant "did deal with them," but Gregory could not "testify if [defendant] gained their confidence." On redirect, the prosecutor asked Gregory whether defendant "actually infiltrated a criminal organization?" Gregory responded by denying that defendant was involved with "a criminal organization." He explained defendant dealt with "bad guys selling guns[,]" whom defendant knew before "he actually began working with" Gregory.

Defendant argues that because one of his defenses was that he never possessed a weapon and that the police never found the weapon he allegedly used to threaten Waldron and Pastor, the officers' testimony "had the capacity to serve as propensity evidence that [he] was likely to possess a weapon." For that reason, "[a]dmission of this testimony without a limiting instruction was reversible error because the question of whether [he] possessed a weapon during the offense was one of the key issues for the jury." We disagree.

Notably, defendant did not object or seek to strike any of the challenged testimony, nor was his argument raised before the trial court in any other fashion. We therefore consider his argument under the "plain error" standard that is, whether defendant proved that an error occurred that was "clearly capable of producing an unjust result[.]" R. 2:10-2; State v. Prall, 231 N.J. 567, 581 (2018).

Applying that standard, we conclude there was no error committed by the court when it allowed the challenged testimony and did not sua sponte deliver a limiting instruction, especially in the absence of any objection from defendant. Even if defendant had objected or requested a limiting instruction, it is clear that the challenged testimony was given only in response to defense counsel's "opening the door" to a discussion about defendant's

experience with guns during cross-examination. Defense counsel's questions justified the prosecutor "elicit[ing] otherwise inadmissible evidence [because] the opposing party has made unfair prejudicial use of related evidence." Prall, 231 N.J. at 582-83 (quoting State v. James, 144 N.J. 538, 554 (1996)) (addressing the doctrine of "opening the door" and defining it as "a rule of expanded relevancy [that] authorizes admitting evidence which otherwise would have been irrelevant or inadmissible in order to respond to (1) admissible evidence that generates an issue, or (2) inadmissible evidence admitted by the court over objection"). Moreover, even if it was an error to allow the testimony without an instruction, we conclude it was harmless in light of the other "overwhelming admissible evidence" of defendant's guilt. Id. at 589.

V.

We turn next to defendant's argument in Point IV of his brief, also raised for the first time on appeal, regarding the court not severing for trial, on its own motion, the counts in the indictment relating to his impersonating a police officer while securing Patel's car from the counts relating to the same crime being committed during his interaction with Waldron and Pastor. He argues that the "[f]ailure to sever the incidents -- which took place on different days, at different locations, and with different

victims -- allowed the State to bolster its cases by presenting [the] narrative that [defendant] had the propensity of impersonating a law enforcement officer." Defendant therefore contends that "[b]ecause of this improper joinder, [defendant] was denied due process and a fair trial[.]"

We conclude that defendant's argument is "without sufficient merit to warrant discussion in a written opinion[.]" R. 2:11-3(e)(2). We observe only that defendant never filed a pre-trial motion to sever as required by court rule, see R. 3:15-2(c) (requiring motions to sever to be made before trial), and failed to meet his burden to make "a strong showing of probable prejudice . . . to warrant a finding of 'plain error.'" State v. Keely, 153 N.J. Super. 18, 23 (App. Div. 1977) (quoting State v. Baker, 49 N.J. 103, 105 (1967)). Such prejudice exists when evidence admitted as proof of one charged crime would not be admissible in the trial of another charge. State v. Blakney, 389 N.J. Super. 302, 327 (App. Div.), rev'd on other grounds, 189 N.J. 88 (2006).

Suffice it to say that evidence of defendant securing Patel's vehicle by impersonating an officer was admissible as proof of preparation and planning his kidnapping and robbery of Waldron and Pastor while again impersonating an officer. See N.J.R.E. 404(b) (providing that "evidence of other crimes, wrongs, or acts

. . . may be admitted [to prove] motive, opportunity, intent preparation, plan, knowledge, identity or absence of mistake or accident when such matters are relevant to a material issue in dispute." (emphasis added)). Because "the evidence establishe[d] that [the] multiple offenses [were] linked as part of the same transaction or series of transactions," there was no showing of prejudice. State v. Moore, 113 N.J. 239, 273 (1988). The trial court properly denied defendant's motion.

## VI.

In Point V of his brief, defendant also raises for the first time on appeal, a challenge to the trial court's jury instruction on kidnapping. The court charged the jury as to kidnapping essentially following the Model Jury Charges (Criminal), "Kidnapping (N.J.S.A. 2C:13-1b(1) to (3))" (rev. Oct. 6, 2014). As set forth in the model charge, the court instructed the jury throughout the charge to determine whether a victim was "'unlawfully removed' and/or 'unlawfully confined[.]'" It did not give any instruction within that charge as to the need for unanimity in the jury's verdict as to which type of kidnapping they found, although the court did generally charge the jury that "Your verdict, whatever it may be as to each crime charged, must be unanimous. Each of the [twelve] members of the deliberating jury must agree as to the verdict." The jury verdict sheet also

did not segregate the theories of kidnapping that the jury could find defendant guilty of committing.

Defendant argues that the trial court erred when it instructed the jury that it must convict if the State proved beyond a reasonable doubt either theory of kidnapping (asportation or confinement), without "requir[ing] unanimity on which theory [the jury] found . . . defendant guilty." We disagree.

We begin by acknowledging "[a]ppropriate and proper charges are essential for a fair trial." State v. Baum, 224 N.J. 147, 158-59 (2016) (alteration in original) (quoting State v. Reddish, 181 N.J. 553, 613 (2004)). "The trial court must give 'a comprehensible explanation of the questions that the jury must determine, including the law of the case applicable to the facts that the jury may find.'" Id. at 159 (quoting State v. Green, 86 N.J. 281, 287-88 (1981)). "Thus, the court has an 'independent duty . . . to ensure that the jurors receive accurate instructions on the law as it pertains to the facts and issues of each case, irrespective of the particular language suggested by either party.'" Ibid. (alteration in original) (quoting Reddish, 181 N.J. at 613). "Because proper jury instructions are essential to a fair trial, "erroneous instructions on material points are presumed to" possess the capacity to unfairly prejudice the

defendant." Ibid. (quoting State v. Bunch, 180 N.J. 534, 541-42 (2004)).

When a defendant fails to object to an error regarding jury charges, we again review for plain error. State v. Funderburg, 225 N.J. 66, 79 (2016). We must be satisfied that there is more than "[t]he mere possibility of an unjust result . . . . [t]o warrant reversal . . ., an error . . . must be sufficient to raise 'a reasonable doubt . . . as to whether the error led the jury to a result it otherwise might not have reached.'" Ibid. (sixth alteration in original) (citations omitted). A jury "charge must be read as a whole in determining whether there was any error." State v. Torres, 183 N.J. 554, 564 (2005) (citing State v. Jordan, 147 N.J. 409, 422 (1997)). Moreover, the effect of any error must be considered "in light 'of the overall strength of the State's case.'" State v. Walker, 203 N.J. 73, 90 (2010) (quoting State v. Chapland, 187 N.J. 275, 289 (2006)).

A jury must reach a unanimous verdict in a criminal case. N.J. Const. art. I, ¶ 9; R. 1:8-9. "The notion of unanimity requires 'jurors to be in substantial agreement as to just what a defendant did' before determining his or her guilt or innocence." State v. Frisby, 174 N.J. 583, 596 (2002) (quoting United States v. Gipson, 553 F.2d 453, 457 (5th Cir. 1977)).

A-3708-15T2

Ordinarily, a general instruction on the requirement of unanimity suffices to instruct the jury that it must be unanimous on whatever specifications it finds to be the predicate of a guilty verdict. There may be circumstances in which it appears that a genuine possibility of jury confusion exists or that a conviction may occur as a result of different jurors concluding that a defendant committed conceptually distinct acts.

[State v. Parker, 124 N.J. 628, 641 (1991).]

A general instruction may not be sufficient

where: (1) a single crime could be proven by different theories supported by different evidence, and there is a reasonable likelihood that all jurors will not unanimously agree that the defendant's guilt was proven by the same theory; (2) the underlying facts are very complex; (3) the allegations of one count are either contradictory or marginally related to each other; (4) the indictment and proof at trial varies; or (5) there is strong evidence of jury confusion.

[State v. Cagno, 211 N.J. 488, 517 (2012) (citing Frisby, 174 N.J. at 597).]

"Although the need for juror unanimity is obvious, exactly how it plays out in individual cases is more complicated." Frisby, 174 N.J. at 596. Thus, although an instruction regarding unanimity as to a specific charge "should be granted on request, in the absence of a specific request, the failure so to charge does not necessarily constitute reversible error." Parker, 124 N.J. at 637.

We apply a two-prong test to determine whether a specific unanimity instruction is required. Cagno, 211 N.J. at 517 (citing Parker, 124 N.J. at 639). The first inquiry is "whether the allegations in the . . . count were contradictory or only marginally related to each other . . . ." Parker, 124 N.J. at 639. The second inquiry is "whether there was any tangible indication of jury confusion." Ibid.

Applying the first inquiry, we find no basis for concluding that a specific unanimity charge was warranted. In this case, defendant never disputed the asportation or confinement of Waldron or Pastor. Rather, he asserted at trial that their accompanying him in Patel's vehicle was voluntary on their part in order to avoid prosecution as drug dealers. The allegations are more than "marginally related" and not in dispute.

Under the second inquiry, although the use of "and/or" is not condoned in particular factual scenarios because the practice invites the possibility of non-unanimous verdicts, see State v. Gonzalez, 444 N.J. Super. 62, 75-76 (App. Div. 2016)[18] (overturning a conviction because the improper use of the phrase "and/or" in a jury instruction injected ambiguity into the charge in the discrete

---

[18] Notably, the Supreme Court in denying certification in Gonzalez commented that "[t]he criticism of the use of 'and/or' is limited to the" specific facts of that case. State v. Gonzalez, 226 N.J. 209 (2016).

factual context of that case), there was no risk in this case that the jury was confused or misled by the court's instructions as "the underlying facts [were not] very complex[.]" Cagno, 211 N.J. at 517. The State's evidence demonstrated a continuous, unbroken course of criminal conduct against the victims defendant was accused of kidnapping. The circumstances did not present "a reasonable possibility that a juror will find one theory proven and the other not proven but that all of the jurors will not agree on the same theory." Parker, 124 N.J. at 635 (citation omitted). The jury also gave no indication that it was confused as to unanimity. It did not ask questions suggesting an inability to reach unanimity on any of the essential elements of the kidnapping offense. See, e.g., State v. Gentry, 183 N.J. 30, 31-32 (2005).

Given the absence of any objection, and the fact that the court followed the appropriate Model Jury Charge, its failure to give a specific unanimity charge, instead of a general one, without any request, did not "possess[] a clear capacity to bring about an unjust result." State v. Adams, 194 N.J. 186, 207 (2008) (quoting State v. Jordan, 147 N.J. 409, 422 (1997)).

VII.

We conclude by addressing defendant's argument that his sentence was excessive. At the time of his sentencing, defendant had nine prior convictions, which include second-degree unlawful

38

possession of a rifle, second-degree attempted escape, three separate second-degree robberies, and second-degree eluding. As noted earlier, the sentencing court granted the State's motion for the court to exercise its discretion under N.J.S.A. 2C:44-3(a), and sentence defendant in the extended term for a first-degree crime. In doing so, the court recited in detail each of defendant's prior convictions and sentences, and applied appropriate aggravating factors as well as mitigating factors based upon defendant's prior service as a CI and the hardship of defendant being sent to prison.[19] It carefully explained on the record why it was not applying the additional mitigating factors argued by defendant. The court concluded that the aggravating factors outweighed the mitigating factors, but did so without expressly providing the weight it assigned to each factor. It ultimately imposed its aggregate twenty-year sentence, which was also within the ordinary term for a first-degree offense, even

---

[19] The court found three aggravating factors and two mitigating factors: (1) aggravating factor three, N.J.S.A. 2C:44-1(a)(3) (the risk existed that defendant will reoffend); (2) aggravating factor six, N.J.S.A. 2C:44-1(a)(6) (the extent of defendant's prior criminal record and the seriousness of the offenses); (3) aggravating factor nine, N.J.S.A. 2C:44-1(a)(9) (the need to deter defendant and others from violating the law); (4) mitigating factor eleven, N.J.S.A. 2C:44-1(b)(11) (defendant's imprisonment will entail excessive hardship); and (5) mitigating factor twelve, N.J.S.A. 2C:44-1(b)(12) (the willingness of defendant to cooperate with law enforcement authorities).

though defendant was facing up to life in prison within the extended term. Moreover, even within the extended term, the twenty-year sentence was the lowest possible sentence.

On appeal, defendant contends the sentencing court's imposition of a "discretionary extended term of twenty-years['] imprisonment with an [eighty-five percent] period of parole ineligibility" was "manifestly excessive," although he does not challenge the court's decision to grant the State's motion for sentencing within the extended term. Rather, he argues, "[t]he court . . . failed to provide a statement of reasons for aggravating factor nine, improperly declined to find mitigating factor eight, and conducted a quantitative, rather than qualitative, analysis of the factors." He also contends that the judge erred in rejecting mitigating factor eight and that the sentencing court failed to state the weight it afforded to each of the factors as required by State v. Case, 220 N.J. 49, 69 (2014). According to defendant, had the court engaged in this qualitative analysis, it should have imposed a lesser sentence because it should have assigned greater weight to mitigating factors eleven and twelve. Defendant explains that his status as a CI would subject him to even greater hardship in prison evidenced by the fact that he was already physically assaulted. With respect to mitigating factor twelve, defendant states that the judge should

have assigned significant weight to that factor because he helped the State secure multiple convictions of dangerous criminals.

Our review of sentencing determinations is limited and is governed by the "clear abuse of discretion" standard. State v. Roth, 95 N.J. 334, 363 (1984). That standard applies equally to a court's decision to sentence an eligible defendant in the extended term. See State v. Young, 379 N.J. Super. 498, 502 (App. Div. 2005). We are bound to uphold the trial court's sentence, even if we would have reached a different result, "unless (1) the sentencing guidelines were violated; (2) the aggravating and mitigating factors found . . . were not based upon competent and credible evidence in the record; or (3) 'the application of the guidelines to the facts . . . makes the sentence clearly unreasonable so as to shock the judicial conscience.'" State v. Fuentes, 217 N.J. 57, 70 (2014) (quoting Roth, 95 N.J. at 364-65).

Applying these controlling principles, we conclude that the sentencing court properly applied the sentencing guidelines, including a comprehensive analysis of defendant's eligibility for sentencing as a persistent offender under N.J.S.A. 2C:44-3(a), see State v. Hudson, 209 N.J. 513, 526-27 (2012); State v. Carey, 168 N.J. 413, 425-27 (2001), and considered each of the applicable aggravating and mitigating sentencing factors. While we acknowledge that the court did not expressly state the weight it

placed on each of the factors, its decision to sentence defendant to the lowest possible sentence within the extended term, see N.J.S.A. 2C:43-7(a)(2), indicates that defendant received the full benefit of the weighing process. Cf. State v. Kruse, 105 N.J. 354, 363 (1987) (stating that a qualitative analysis "is critical when . . . the court deviates from the norm" in sentencing a defendant). Moreover, the court's findings were supported by the record and the sentence imposed did not "shock [our] judicial conscious." Roth, 95 N.J. at 365.

To the extent that we have not specifically addressed any of defendant's remaining contentions, we conclude they are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3708-15T2